Chief Justice Robertson
delivered the Opinion of the Court.
John Bartlet having, by his last will, published in the year 1813, devised to his wife Margaretta, after the payment of his debts, all his estate, consisting chiefly of his joint stock in the mercantile firm of Bartlet & Cox, in the city of New Orleans, and of about seven thousand dollars on deposite in a bank at Cincinnati in Ohio, and of some household furniture in Kentucky, and having died early in the year 1814, in the said city of New Orleans, in the State of Louisiana, where he was then domiciled — Joseph H. Hawkins and Lewis Sanders, of the city of Lexington, (who, together with Samuel Winter and William W. Montgomery, of the city of New Orleans, were nominated as the executors of the will,) had the same proved and admitted to record in the County *346 Court of Fayette, in which the city of their residence was situated; and, having taken the oaths prescribed by law, executed an executorial bond, in the penalty of twenty thousand dollars, with James Wier as their surety, and with a condition requiring them, among other things, “ well and truly to administer according to law5’ —“the goods, chattels and credits” of the testator, which should come to their “ hands, possession, or knowledge.”
On the 25th of January, 1816, Joseph H. Hawkins bought Mrs. Bartlet’s interest, as a devisee, in the mercantile establishment of Bartlet & Cox, for which he agreed to pay her whatever James Morrison, Charles Wilkins, and William W. Montgomery, should determine to have been the value of it on the 1st of January, 1816; and afterwards he advanced,to her about seventeen thousand dollars.
Sanders and Hawkins sold, in 'Lexington, the household furniture belonging to the testator at his death, for about nine hundred dollars, and disposed, also, of the money deposited by him in the Cincinnati bank, nearly the whole of which latter sum was applied to the payment of an individual debt due by Sanders to the same bank; and seven hundred dollars of the furniture sale was received by Hawkins; the residue by Sanders.— But they never, either reported any inventory of the testator’s estate, or made .any settlement with the County Court of Fayette.
Mrs. Bartlet having intermarried with Thos. Fletcher, and afterwards died, her husband, who survived her, was qualified as her administrator, and, in February, 1824, he brought a suit in chancery, in the Fayette Circuit Court, against Sanders and the surety Wier, alleging that, Hawkins having died insolvent, no person had been appointed his personal representative; and praying for a decree for an account of the personal estate of the. testator. And, the administrator having died during the pendency of the suit, it was revived in the name of Richard Hawes, as administrator de bonis non.
The answer of Sanders contains nothing material, except what will be hereafter noticed; and that of Wier *347 required proof of most of the more important allegations; denied that the County Court of Fayette had jurisdiction to grant probate of the will, and insisted that, if that Court had any jurisdiction, it was circumscribed to the assets which might have been subject to administration in Kentucky, and that the executorial bond, if binding at all, should be deemed obligatory on him as surety, to no greater extent than those local assets.
A suit in chance-’adm’rf may 1)e revived, after his death, by an aam’r de bonis non- As an action at Jaw, query.
No court of this ®.ta*e lias luns" probate of a will mi the estate of a do domidled'^here! died abroad — un this State; and then betongs exclusive ^erothe'assets are.' .But-
Where a court of probate, in this State, has taken jurisdiction, the presumption is in favor of its legality; and he who alleges that the court has exceeded its jurisdiction, must show it: for that, proof that the decedent was a non-resident, not domiciled here, would be, prima fade, sufficient; but might be rebutted, by sho wing that smne of his effects were sold by the ex’or or udm’r here.
The Circuit Court having dismissed the bill, the following questions are presented for revision: first — Could the suit be revived in the name of the administrator de bonis non9 Second-Had the County Court of Fayette any jurisdiction? Third — If it Ijad, to what extent was Wier’s bond obligatory on him as surety? Fourth — Was the plaintiff in error entitled to any relief, and, if any, what?
First. Whatever might be the technical rule in an action at law, we have no doubt that, in equity, a suit brought bv an administrator, may be revived and prose- , , , . . ,' . r . ... cuted by an administrator de boms non, after the admm-istrator’s death. 1 Williams on Executors, 597; Owen vs. Curzon, 2 Vernon, 237; Mitf. Plead. 64, 4th ed. n. 9.
Second. As the proof leaves no room for doubting that the testator’s domicil was in the State of Louisiana, where he died, no Court in this State had jurisdiction to grant probate of his will, or letters of administration, unless he had assets here. Nor, although the fact of his having household furniture within the limits of Kentucky, at the time of his death, as well as at the date of the probate, has been admitted by Wier, would the County Court of Fayette have had any jurisdiction, unless that property, or some of it, had been in the county of Fayette; and there is no positive proof, as against Wier, that any of it was there; for, though Sanders, in ins answer, says that it was all there, yet his answer is not, as to such a matter, conclusive against Wier, who admits only that the testator had assets in Kentucky.
But the practical doctrine is well settled, that the as *348 sumption of jurisdiction by á probate court of this State, is prima facie evidence of the fact that such court had rightful authority to act as it did, and throws on any person who may deny its jurisdiction, the burthen of proving that it had transcended its authority. Proof of the fact that Bartlet was not domiciled in Kentucky, may, perhaps, have been sufficient to countervail the presumption of jurisdiction arising from the mere assumption of cognizance by the County Court of Fay-’ette. But then, the sale of the furniture in Lexington, and the admission by Sanders, coupled with that of Wier, should, in our opinion, be sufficient to confirm the prima facie presumption of jurisdiction in that Court, in the absence of any other fact to the contrary, than that of the testator’s foreign domicil at the time of his death.
Letters of admin by one natioifor State, can have se,°^naanother Every adm’r be-toS theC°tribuna'i from which he re ceived his authority, no one is re-sponsibic to any foreign govern-menf; nor can he sue or be sued, chnmcter, in any foreign State.
The movable pro perty of a decedent, being personal, is subject to the law of his domicil for every purpose except administration ; and is distributable according to that law.
*348 We are, therefore, of the opinion, that the fiducial bond taken by the County Court of Fayette, is, to some extent at least, obligatory on Wier, as a statutory bond.
Third. It is a well settled doctrine, that letters of administration granted by one nation or State, can have no operation, per se, within the jurisdiction of another nation or State; and that, therefore, such authority, be-íng local, can, de jure,vest no right of suit in any other country than that in which it was granted; for, as it is the duty of every government to secure to its own citizens, . , , a just participation m the distribution ox the assets with-jn its protection and control, belonging to every deceas-1 . . / , , , ed debtor ot any ot those citizens, wherever he may have or died, it is an established rule of international law, that assets shall be administered under the authority 0p the iocal sovereign. And consequently, as every administrator must, also, account to the proper tribunal of the country from which he derived all his authority, he is responsible to no foreign government for the administration of assets received under that authority, and cannot either sue or be sued, in his representative character, in a foreign State. (Story on the Conflict of Laws, 422, and the numerous cases therein cited.)
But, nevertheless, movable property having no situs— , ... , because it is deemed personal, and therefore subject to *349 the law of the owner’s domicil, in every respect except for the purposes of administration — it should be distributed according to the law of that domicil. (Ibid. 420.)— And therefore, if an administrator, appointed under the law of the domicil, can rightfully get possession of assets any where, it would be but right that he should do so; and, of course, if he should be permitted to get into his hands assets from a foreign country, without suing for them, and without obtaining new letters of local administration, they may be deemed assets in his hands at the domicil, and he may be responsible for the administration of them, according to the law of the domicil. And if he cannot lawfully get possession of such assets in a foreign country, without subjecting himself to the responsibilities of a local administration, it would be right to endeavor to obtain such local authority, unless some other person shall have been appointed to administer those assets.— Ham. on Assets, Ch. XVI. p. 23d, and 2 Williams on Executors, 1016.
An administrator appointed under the law of the do mieil, may rightfully .get • the assets from any foreign State, if practicable without suit, or local administration ; and when thus obtained , they will be like other assets in his hands. And it would be right for him to obtain a local administration, if necessary to obtain the assets in a foreign State— unless there is an adm’r there; and the adm’r of the domicil is generally preferred in selecting a local adm’r, ex comi-tate.
A local adm’r is merely ancillary to the adm’r of the domicil, and any residuum of assets in his hands, after administration according to the local law, belongs, and should be transmitted, to the principal administrator , for distribution.
or not within the An ancillary administrator has no control over assets not subject to the law, . . . jurisdiction, of the place where he was appointed; and if he obtains any such assets, he does it without authority, and his sureties are not bound for the faithful administration of them. But the sureties of the administrator of the domicil are bound for all assets that come to his hands, wherever obtained. A bond that was due to a deceased obligee, is assets where he resided, or where the bond was when he died. But a debt due by parol, is assets only in the State where the debtor resides— unless it is recov ered by the domiciliary adm’r.
*349 Ex comitate, however, the administrator of the domicil will generally be preferred in, the granting of letters of local administration in a foreign country.
But, whoever shall be the administrator appointed to administer assets in any other country than that of the domicil, his administration will be ancillary to that of the domicil. And therefore, if, after accounting according to the local law, any residuum of assets shall remain in the hands of the ancillary administrator, they will belong to the domicil, and should be transmitted to the principal administrator there, to be finally administered or distributed according to the law of the domicil. Story’s Conflict of Laws, 423.
It is an obvious consequence, from the foregoing considerations, that an ancillary administrator can have no control over assets which are not subject to the law under which he was appointed, or over assets elsewhere than within the jurisdiction of the sovereignty from which he derived his authority. And consequently, as *350 his surety will be liable only for his faithful administra» tion of such assets as he had a right to receive, and was therefore bound to administer, he would not be charge-ak]e por misapplication of assets received, without authority, any where else than in the country in which the administrator was appointed.
But, as an administrator of the domicil may have authority to receive assets any where, his surety will'be responsible for all the assets which shall have lawfully come to his hands from any part of the world, and which he has not legally administered. Then, had Sanders and Hawkins been local administrators, instead of executors, there could be no doubt that Wier, as their surety, would not be liable to any greater extent than the amount of assets which had come to their hands in Kentucky, or which it was their duty to get into their possession in this State. See, also, Goodwin vs. Jones, 3 Massachusetts Rep. 515; Stephens vs. Gaylord, 11 lb. 266; Cutter vs. Davenport, 1 Pickering’s Rep. 82; Hooker vs. Olmstead, 6 Ibid. 482; Daniel vs. Luker, Dyer, 305; Cro. Eliz. 472; and Hilliard vs. Scott, 1 Lord Ray. 562.
In the case just cited, in Dyer’s Reports, the Court decided that a release by an ancillary administrator in Ireland, of the amount of a bond which was in England at the date of the obligee’s death, who was domiciled in England, should not exonerate the obligor from liability to pay the amount of the same obligation afterwards, to the administrator of the domicil, who alone was entitled thereto, and in whose hands alone, therefore, the amount of it, when paid, was assets — even though the debtor lived in Ireland.
It has been decided, also, that a payment in one State to an administrator of the domicil in another State, who had a right to receive the debt so paid, would exonerate the debtor from other and future liability for the same debt elsewhere. Stephens vs. Gaylord (supra); Story’s Conf. Laws, 431.
And it has been moreover decided, that an administrator of the creditor’s domicil may have a right, in a foreign country, to receive a debt from a debtor there.— See Doolittle vs. Lewis, 7 John. Chy. Rep. 49; Atkins vs. *351 Smith, 2 Atkins, 63; Shultz vs. Pulver, 3 Paige’s Reports, 182.
in anothef State, do not The bonds given in this State, by executors, upon taking on themselves the execution of the will of a testator who has died domicil-subject the sureties to a more ex tensive liability, than the sureties of a local adm’r incur. The liability, in either cáse, is limited to the assets which were, or ought to have been , rightfully received in this State. So—
residing in New Orleans nomina-Where a testator ted some executors who resided there, and some who resided in Kentucky, and the latter proved the will, gave bond, and were qualified in a county of Kentucky, where the testator, had some assets: held, that the surety in the bond cannot be made liable for money of the testator deposited in a Bank in Cincinnati, and which never was in Kentucky — nor for any assets in Louisiana.
But it was said by Parsons, Chief Justice, in the case of Goodwin vs. Jones, (supra,) that even the administrator of the domicil would have no right to receive a simple contract debt due to his intestate by a person residing, at his death, in a foreign State. That dictum should, however, be restricted to a case in which, at the time of payment, there was a local administration. Story’s Con. Laws, 431, n. 2.
It seems to be well settled, too, that a bond will be assets in the country of the deceased obligee’s domicil, or in the country where the bond happened to be at the time of the obligee’s death; but that a debt due by parol contract will always be assets in the State where the debtor resides, unless it shall lawfully come to the hands of the domiciliary administrator.
It is evident, therefore, that, if Sanders and Hawkins had been ancillary administrators, instead of executors, the money on deposite in Cincinnati could not have been assets in their hands, for which Wier, as their local surety, would have been liable — especially as the money never was brought to this State.
Does the fact that they were executors, having legal authority to receive debts due to their testator any where, without a probate of his will or the execution of . f , ... . „ , _ , a fiducial bond, enlarge the obligation of their Kentucky bond, coextensively with such independent and preex-istent common law power, derived from the will merely? We think not. Their surety’s liability is still, as we think, limited to the assets which rightfully came, or ought to have come, to their hands in Kentucky.
In this respect, we have seen no case or dictum which discriminates between administrators and executors; and we can perceive no sufficient reason for any such discrimination.
The probate in the County Court of Fayette, gave to *352 the executors no authority beyond the limits of Kentucky. That Court of probate had only a special and limited jurisdiction, confined to the assets in this State. 0^60† 0f bon(j given, was to secure the faithful administration of those assets only, and to compel the executors to account for them and them only, to the Court which granted the probate and tools the bond. So far, and only so far, as the probate in the County Court of Fay-ette gave authority to' the executors, it was the province of the Court, and the intention of the Legislature, to require security, that they would act faithfully within the sphere of duty prescribed by the laws oí Kentucky. The obligation of the bond should, therefore, be limited by the jurisdiction of the Court in which it was given, and by the object of requiring it; and the condition of the bond given in this case, is, not only constructively, but expressly, circumscribed within those just and reasonable bounds. The condition — being that prescribed by the statute of 1797, (1 Stat. Law, 659) — requires the executors, first — to make an inventory of all the assets -which shall come to their knowledge or possession; secondly— to exhibit that inventory in the County Court of Fayette, whenever “ thereto required by the said Court;” thirdly— to administer, according to law, “ the same goods, chattels and credits,” and, fourthly — “ to make a just and true ac- “ count of all (their) actings and doings therein, when “ thereunto required by the said Court.”
From the character of these requisitions, it is evident that, in requiring an inventory to be made and reported to the County Court of Fayette, of “all the goods, chattels and credits of the deceased,” the County Court contemplated only such “goods, chattels and credits” as would be assets in Kentucky, over which alone that Court could have jurisdiction, and concerning which only it could require an account and settlement. Such, in our opinion, is even the literal import of the condition of the bond as given in this case; and a condition more comprehensive would have been unreasonable: first — because the jurisdiction of the County Court of Fayette being limited to the assets in Kentucky, that Court had no authority to require a bond for any other purpose than that of se ■ *353 curing the faithful administration of those local assets; and, secondly — because, if executorial bonds had been, as they ought to have been, and possibly were, given in Louisiana and in Ohio, surely all the. sureties in the three States could not have been made contributary for any defalcation of the executors in any one or in all of them; and, a fortiori, if there was a foreign administration, with the will annexed or otherwise, Wier, as surety of the executors in Kentucky, could not have been held responsible for assets received in such foreign State, and never brought to this State.
Conclusions, upon evidence recited.
But Wier’s liability on his bond, and according to the condition thereof, cannot depend on the accidental circumstance of the execution or non-execution of a similar bond by others in Louisiana or Ohio.
It therefore seems to us, that Wier is liable only for assets which came to the hands of the executors in Kentucky. And, consequently, as the money on deposite in Cincinnati was never in this State, nor subject to 'the power of the County Court of Fayette, he is not responsible therefor.
In this conclusion Judge Ewing does not concur.
Nor is Wier liable for the assets in Louisiana; because, first — they never were in Kentucky; and, secondly— the legatee sold all her interest therein, and was therefore afterwards entitled to no claim therefor on the executors.
Fourth. As, according to the foregoing considerations, Wier is not liable for any portion of the testator’s estate which never came to the hands of either Hawkins or Sanders in Kentucky, he cannot, in any event, be made responsible, in this suit, for more than the amount for which the furniture was sold in Lexington.
The questions yet to be considered, therefore, are, first — whether there should have been any decree against Wier, on account of that furniture; and, secondly — what should have been the decree as to Sanders.
First. Though it does not appear that Hawkins paid to Mrs. Bartlet, on account of her interest in Louisiana, more than she was entitled to receive under their contract, yet it appears that he had advanced to her alto *354 gether, seventeen thousand dollars at least; and it does not appear that as much as seventeen thousand dollars had been, or ought to have been, paid to her in fulfilment of that contract.
The deposition of a party, in ch. read without objection, is evidence for his co-defendant.
Littleberry Hawkins, the only witness whose deposition alludes to the specific sum paid, or to have been paid, by Joseph H. Hawkins, for Mrs. Bartlet’s interest in the house of Bartlet & Cox, says, that he (J. H. Hawkins,) “ agreed to give Mrs. Bartlet between fifteen and “ seventeen thousand dollars for said interest;” and also says, “I have heard my brother (the said J. H. H.) and “ Mrs. Bartlet both say, he had complied with his en- “ gagement to her in that purchase.”
Sanders, in his answer, says, that Bartlet’s estate being very much embarrassed with debts, and Mrs. Bart-let needing the means of immediate support, she, “for a “ valuable consideration, sold and transferred to the said 51 Joseph H. Hawkins, her entire interest in the said es-“iate of her husband;” and that Hawkins' afterwards paid to her, in fulfilment of that contract, sixteen thousand dollars, and also, in addition thereto, furnished a house for her, with furniture which cost more than the amount ($900) for which Bartlet’s furniture had been previously bought by Hawkins himself.
And in his deposition, (by which party taken, it does not appear,) Sanders states the same facts, and says that it was known when Bartlet died, that he was, as a Deputy Quartermaster General, largely indebted to the United States, and that the money deposited in the Cincinnati Bank, had been placed there to his credit, as, Quqrter-ma’sler General, for the purpose of paying that debt, or a portion of it; and also says, that he believes that Hawkins had paid Mrs. Bartlet, “ the whole sum agreed on,” for her entire interest in her husband’s estate. And that deposition, haying been read without any objection, must be admitted as some evidence — so far, at least, as Wier is concerned.
In addition to those facts, it does not appear that Mrs. Bartlet’s interest in the house of Bartlet & Cox, was ever estimated as of a higher value than the amount (that is, between $15,000 and $17,000,) which L. Haw *355 kins said that his brother had agreed to pay, and did pay, for it. It has even been proved that the interest was not worth more than twelve thousand dollars, in the year 1821.
An ex’or — local as well as domiciliary, is himself chargeable, independent of his bond, for all assets received by him, any where-
When a testator has been dead a great length of time, (20 years in this case,) his ex’or should not bo exempt fiom a decree in favor of a legatee (tendering a refunding bond, ) for funds of the testator which the ex’or has used, upon the ground that the testator liad appropriated them to a particular liability, which, never having been called for, is still outstanding.
These circumstances conduce persuasively, and, in the absence of any countervailing fact, we think sufficiently, to prove that Hawkins had paid Mrs. Bartlet for the furniture he had bought at the sale in Lexington; and this deduction is fortified by the additional fact that, though she survived her husband at least eight years, the record- contains no intimation that she ever pretended to assert or to be entitled to any claim to the money for which the testator’s furniture had been sold, or to any other interest in his estate; and by the fact also, that, according to the evidence now before us, we should presume that seventeen thousand dollars was more than, her residuary interest in the whole estate of the testator was in fact worth, even if her interest had been certain and immediate, instead of being remote and contingent.
The consequence is, that the decree dismissing the bill was, as to Wier, right.
In this conclusion, Judge Ewing concurs.
As to Sanders, the question is somewhat different.— As an executor, he is chargeable, independently of his fiducial bond, for whatever of assets he received any where, and did not legally appropriate. He is liable, therefore, for the money appropriated by him in Ohio to his own use; and if Mrs. Bartlet never parted with her residuary interest therein, he might be liable to her representative in this suit; for though the value of her interest depends on the extent of the testator’s indebtedness, and though so much of his debt to the United States as would absorb more than the entire sum deposited in Cincinnati, still appeal's to be unpaid, yet, after so long a lapse of time without payment, the mere existence of the debt should not prevent a decree in favor of her representative, upon the condition of executing a refunding bond.
Conclusion, from facts and circumstances, that the claims of the legatee, represented by the pltf., had been fully satisfied.
A party may be a witness for him self, by the consent of his adversary: his deposition, read without objection , may operate for him, as well as for his co-deft., especially when, because of his insolvency, he has no real interest.
But as it is evident that Mrs. Bartlet, as well as the executors, was apprised of the existence of the debt to the United States, and of the fact also, that the deposit in Cincinnati had been made in the name of her deceased husband, as Deputy Quartermaster General, for the purpose of meeting that debt, and as, moreover, the amount advanced to her by Hawkins seems to have exceeded the probable value of her interest in the whole estate, (deducting that deposited as already appropriated,) we think that it is altogether probable, without Sanders’ own deposition, that she had relinquished her ulterior interest in the Cincinnati deposit, and had in fact been paid for her entire interest as residuary legatee. It is very probably that, aware of the indebtedness of the testator to the United States, she and the executors considered her interest in the house of Bartlet & Cox as much as she could ever be entitled to, as residuary legatee; and that, in selling that interest, specially, as she did to Hawkins, by a written contract, she intended to part with her whole interest in the testator’s estate. That deduction is, as before suggested, fortified by her apparent acquiescence and satisfaction during her life.
But as Sanders’ deposition was read without objection, we must infer that it was admitted as evidence for himself, as well as for Wier, and the more especially as his own insolvency divested him, in fact, of real interest in the event of the suit. A party may be a witness for himself, if his adversary consent. Sanders’ deposition should, therefore, be entitled to some effect, even on the question whether there should be any decree against himself; and being, not only uncontradicted, but fortified , as it is, by other facts in the record, we think that there should have been no decree against him; and, being insolvent, a decree against him was not sought, and would not, as we presume, be now desired.
In this conclusion, Judge Ewing concurs.
Wherefore, the decree of the Circuit Gourt is affirmed.