## HOLMES, Adm'r, *v.* OREGON & CALIFORNIA RY. Co.*

*(District Court, D. Oregon.   January 29, 1881.)*

1. ADMINISTRATION—JURISDICTION TO GRANT.

By the constitution of this state the county court is a court of record, with general jurisdiction of probate matters, to be regulated by law, (article 7, §§ 1 and 12;) and by statute (Civ. Code, § 869) it has the exclusive power to grant letters of administration upon the estate of a person who at or immediately before his death was an inhabitant of the county. *Held,* (1) that a decree of the county court of Multnomah county, granting letters to D. upon the estate of P., by which it appears to have been adjudged by said court, upon a proper petition, that P. was an inhabitant of the county at or immediately before his death, cannot be questioned collaterally on the ground that P. was not in fact such inhabitant; (2) that said court having general jurisdiction of the subject-matter—the granting of administration upon the vacant estate of a deceased person—it had the authority to inquire and determine whether, in that particular case, the deceased was an inhabitant of the county or not, and that its decision upon the question is conclusive, except upon appeal; and (3) that a subsequent decree by the county court of another county, granting letters of administration upon the same estate to H., while the first were in full force and effect, is null and void.

2. INHABITANT.

The word "inhabitant," as used in the section 869 aforesaid, has a narrower and more limited signification than domicile, and implies a personal presence in the county as a dweller therein.

3. NEGLIGENCE.

The defendant's steam-ferry crossed the Wallamet river to Portland, on a dark night, with passengers from its railway, and P., in stepping from the boat to the pontoon at the landing, stumbled and fell into the river and was drowned. *Held,* that the want of a guard to prevent the passengers from attempting to go ashore before the landing was safely made, and some sufficient signal to warn passengers when it was proper to go ashore, and particularly for the want of sufficient light upon the boat and pontoon to enable passengers to readily observe the same and their relative situation, was negligence, and caused the death of P.

4. CONTRIBUTORY NEGLIGENCE—DRUNKENNESS.

Contributory negligence is matter of defence, and the burden of proof is upon the defendant to establish it; and drunkenness is not *per se* such negligence, but only more or less evidence of it, according to the circumstances.

*See *ante,* 75.

5. COMMON CARRIER.

 A common carrier of passengers for hire is bound to provide for their safety, so far as is practicable, by the exercise of human care and foresight ; and, where one is drowned under the circumstances aforesaid, drunkenness, if it existed, was not contributory negligence.

6. DAMAGES.

 The damages recoverable under section 367 of the Oregon Civil Code, by an administrator for the death of his intestate, are general assets of the estate, and are given merely as a pecuniary compensation for the death, and not as a *solatium* ; nor are they to be exemplary or vindictive, but according to the value of the life, having due regard to the capacity and disposition of the deceased to be useful—to labor and to save.

In Admiralty.

*Sidney Dell*, for libellant.

*Cyrus A. Dolph* and *Joseph N. Dolph*, for defendant.

DEADY, D. J. This suit is brought to recover the sum of $4,900, under section 367 of the Oregon Civil Code, on account of the death of William A. Perkins, the libellant's intestate, alleged to have been caused by the negligence of the defendant, on November 16, 1878, while transporting said Perkins across the Wallamet river at Portland, on its steam-ferry No. 1. The answer of the defendant, in addition to the allegations directly responsive to the libel and contesting the cause of suit therein stated, contains defensive allegations in bar of the same, the equivalent of the pleas of *ne unques* administrator and a prior adjudication at law. These pleas are but different forms of the same defence, and the facts upon which they rest are as follows : In June, 1877, William A. Perkins, then in his twenty-second year, came to Jackson county, Oregon, *via* California, from his native state, Vermont, with his mother and step-father, Michael Riggs, where he remained until September 10, 1878, when the mother, on account of alleged cruel treatment, left Riggs, taking with her her three minor children and the effects which belonged to her, and started for California, where she had a brother living, with the ultimate purpose of going back to Vermont to reside, where she had a son still older than the deceased. The deceased accompanied her, first disposing of a pre-emption

claim on Applegate creek, upon which he and his mother had resided separate from Riggs for some months, and leaving nothing behind him.

At Roseburg they were detained by sickness and poverty until October 10, 1878, when they came to Salem, where for the want of means to pursue their journey they remained until November 16th, when, by aid of others, they started for California on the defendant's railway, and on the evening of the same day, while crossing the river at Portland, the defendant was drowned.

On December 2, 1878, the county court of Multnomah county, upon the proper petition of the mother of the deceased, styling herself "Mary A. Riggs, of the city of Portland," in which it was alleged "that the deceased was, at or immediately before his death, an inhabitant of said county," made an order appointing H. W. Davis administrator of the estate of said William A. Perkins, in which, among other things, it is alleged that, by "the oath of the petitioner," it was "proved" that said Perkins died intestate in Multnomah county, Oregon, he "being at or immediately before his death an inhabitant of said county," which order and appointment are still in full force and effect; and said Davis, in pursuance thereof, duly qualified as such administrator, and on January 2, 1879, brought an action at law in the circuit court of the state for said county against the defendant, under section 367 aforesaid, for the identical cause of suit alleged in the libel herein, in which, on March 31st, said circuit court gave judgment that the plaintiff take nothing thereby, which judgment was, on August 11, 1879, duly affirmed by the supreme court of the state and still remains in full force and effect.

On September 17, 1879, the county court of Jackson county, Oregon, appointed the libellant administrator of the estate of said Perkins, and in pursuance thereof the libellant duly qualified as such administrator, and brought this suit to recover damages for the death of his intestate. Upon these facts the plea of a prior adjudication is not sustained; for although the action of *Davis* v. *The O. & C. Ry. Co.* was for the same

cause as this, it was between different parties plaintiff, who were not privies. The Jackson county administrator is not the successor of the Multnomah one. On the contrary, he claims title to the estate of the deceased by a distinct and independent, if not an adverse grant. His suit proceeds upon the assuption that Davis was not the administrator, and that therefore his action to recover damages belonging to the estate of the deceased was a nullity and of no effect.

The defence that the libellant was "not ever administra-. tor" of the deceased, involves the inquiry: (1) Did the county court of Multnomah county have jurisdiction to grant the administration of the estate of the deceased to Davis when and as it did? (2) Can the decree of said court making said grant be attacked collaterally? The jurisdiction to grant letters of administration upon Perkins' estate was vested in the county court of the county of which the deceased, "at or immediately before his death, was an inhabitant"—"in whatever place he may have died." Oregon Civ. Code, §§ 1051, 1053.

And first, as to the fact—of what county was the deceased "an inhabitant" at or immediately before his death? In the consideration of this question counsel for the libellant assumes that habitation and domicile are in this case convertible terms, and that therefore a person is always an inhabitant of the place in which he has a domicile, and *vice versa*. But I do not think that the term "inhabitant," as used in the statute, is the equivalent of the technical term "domicile."

A habitation is a place of abode—a place to dwell in; and an inhabitant of a place is one who has an actual residence there. But a person's domicile is a place where he may reside in fact, or for many purposes may be deemed to reside. Indeed, a person may have two domiciles at once; "as, for example, if a foreigner, coming to this country, should establish two houses, one in New York and the other in New Orleans, and pass one half the year in each, he would, for most purposes, have two domiciles." Bouvier; Domicile.

A man's domicile, as the word implies, is his house, his home; and it may continue to be such for years, without being

actually inhabited by him.   But an inhabitant of a place is one who ordinarily is personally present there; not merely *in itinere,* but as a resident and dweller therein.   Domicile, as a question of fact, is often one of great difficulty to determine. Yet, in contemplation of law, every one has a domicile somewhere, because upon it generally depends his personal *status,* rights, and duties, and the disposition of his property after his death.   *Abington* v. *North Bridgwater,* 23 Pick. 176; *Mitchell* v. *The U. S.* 21 Wall. 351; *Desmare* v. *The U. S.* 93 U. S. 609.   Furthermore, a person who, in contemplation of law, has a domicile, may, nevertheless, as a matter of fact, be a mere wanderer and not an inhabitant of any place.

Upon this view of the law, I do not think that Perkins can be considered an inhabitant of Jackson county at the time of his death, nor, indeed, of any county in the state.   As a matter of fact he had ceased to reside in Jackson county, and was journeying through the state to California.   Therefore, the power to grant letters of administration upon his estate belonged to the court of the county, if any, of which he was an inhabitant immediately before his death.   He was an inhabitant of Jackson county before his death, but I doubt if he was immediately before.   Immediately means without anything intervening—the very opposite of mediately.   In this statute it signifies that the administration shall be granted in the county of which the deceased was an inhabitant at or last before his death.

The six weeks immediately preceding his death Perkins lived in Marion county, and, although he did not intend to remain there permanently, but only until his mother could obtain the means to get away with, yet I am inclined to the opinion that that was the last county he was an inhabitant of before his death; if it was not, then Jackson county was. However that may be, I do not think Perkins was an inhabitant of Multnomah county at the time of his death, and therefore, as a matter of fact, the county court of that county was not authorized to grant letters of administration upon his estate.   And this brings us to the consideration of the

principal question—can the decree of the county court grant-
ing the letters of administration to Davis be attacked col-
laterally?

By the constitution of the state (article 7, §§ 1, 11, and 12)
it is provided, in effect, that the county court shall be "a court of
record, having the general jurisdiction" "pertaining to probate
courts," to be limited by law; and by section 869 of the Civil
Code it is declared that such court "has the exclusive juris-
diction in the first instance, pertaining to a court of probate,
to grant and revoke letters of administration."

In *Tustin* v. *Gaunt*, 4 Oregon, 305, the supreme court of
the state held that the county court, in exercising the juris-
diction pertaining to probate courts, is a court "of superior
jurisdiction, as contradistinguished from courts of inferior and
limited jurisdiction;" and that its "judgments and proceed-
ings," when questioned collaterally, are entitled to all the
presumptions of law in favor of their legality that pertain to
the judgments of superior courts.

In the case of a judgment of a superior court—a court of
record—the law presumes that the court had jurisdiction
unless the contrary appears; and in the courts of the same
state it has usually been held that, unless the contrary ap-
pears from the record of the case, it cannot be shown at all;
in other words, the validity of the judgment and the juris-
diction of the court that pronounced it must be tried by the
record alone.   But the record of a judgment of a court of a
state may be contradicted in the courts of a sister state or the
United States, as to the facts necessary to give jurisdiction,
and if it be shown that such facts did not exist, the record,
notwithstanding its recitals to the contrary, is a nullity.
*Thompson* v. *Whitman*, 18 Wall. 457; *Pennoyer* v. *Neff*, 95 U.
S. 714.   And the same rule has lately been applied by the
New York court of appeals to domestic judgments. *Fergu-
son* v. *Crawford*, 70 N. Y. 253.

Assuming this to be the rule governing this case, the con-
tention of the libellant is: (1) The county court of Multnomah
county had not jurisdiction to grant the letters of admin-

istration upon Perkins' estate, as it did, unless he was an inhabitant of such county at or immediately before his death; (2) it appears that Perkins was not ever an inhabitant of said county; and (3) therefore the court acted without jurisdiction, and this fact may be shown to contradict the record of Davis' appointment, and thereby destroy its validity.

Upon what fact or facts the jurisdiction of a court to grant letters of administration upon the estate of a deceased person depends, is a nice and vexed question, upon which the authorities are in direct conflict. At common law, the grant of letters by the bishop, when by reason of the locality of the *bona notabilia* of the deceased—the equivalent of inhabitancy —the power did not belong to him, was void, but when made by the metropolitan, under like circumstances, it was only voidable. Toller on Ex. 53.

In Massachusetts, in *Cutts* v. *Haskins*, 9 Mass. 543, it was held that the grant of administration by a judge of probate on the estate of a deceased person, not at his death an inhabitant of the county in which such administration was granted, was simply null and void. This ruling was followed in *Holyoke* v. *Haskins*, 5 Pick. 20, and 9 Pick. 259, when the legislature intervened, and declared that the jurisdiction assumed by a probate judge, so far as it depends upon the place of residence of any person, shall not be contested, except directly upon appeal, unless the want of jurisdiction appears upon the record. Rev. St. *c.* 83, § 12.

To the same effect is the ruling in *Becket* v. *Selover*, 7 Cal. 233; and in *Fletcher* v. *Weir*, 7 Dana, 345, it was held that the decree of a probate court, admitting a will to probate, was *prima facie* evidence of its jurisdiction, which, it was said, might be overcome by showing that the testator was not domiciled in the state. On the other hand, it has been held that where a probate court grants letters of administration upon a petition which states the facts necessary to give the court jurisdiction, the decree of the court is not void, and cannot be questioned collaterally, although the residence of the deceased at or last before his death was not, in fact, in

the county where the letters were granted.  Such has been the ruling in Virginia, *(Fisher v. Bassett,* 9 Leigh, 119; *Andrews v. Avory,* 14 Grattan, 236;) in Vermont, *(Abbott v. Coburn,* 28 Vt. 667;) in Texas, *(Burdette v. Silsbee,* 15 Tex. 615;) in Missouri, *(Johnson v. Beazley,* 65 Mo. 264;) in Alabama, *(Coltart v. Allen,* 40 Ala. 155;) in California, *(Irwin v. Scriber,* 18 Cal. 503;) and in New York, *(Bumstead v. Read,* 31 Barb. 664; *Bolton v. Brewster,* 32 Barb. 393.)

The reasons given for these rulings are not always the same, or even harmonious.  The subject is not a simple one, and affords a good opportunity for subtlety and refinement. All the cases, however, have gone, more or less, upon the argument of convenience, and the fact that any other rule is impracticable, and would leave all rights dependent upon or growing out of the grant of letters of administration in an unsettled and precarious condition.  But in my judgment the conclusion reached in these cases is legally correct, as well as practically just.

The county courts of Oregon have the general and exclusive jurisdiction to grant letters of administration upon the estates of deceased persons, to be exercised, however, by each county court only in cases where the deceased was an inhabitant of that county at or immediately before his death.  The subject-matter — the granting of administration upon the estate of a deceased person without an administrator—is within the general jurisdiction of every county court in Oregon, but the exercise of it in particular cases depends upon the existence of particular facts, which must be ascertained by the court in the manner prescribed by law, and in the exercise of its admitted jurisdiction to grant letters of administration in the cases enumerated in the statute.  But if the person is not dead, or the administration of his estate has already been disposed of, then the subject-matter is not within the jurisdiction of the court; it does not exist, and a decree appointing an administrator in such case is simply void.  I am aware that the court of appeals of New York *(Roderigas v. E. R. S. Institution,* 63 N. Y. 460) by a bare

majority have held that a grant of administration by a surrogate was a judicial determination of the death of the person upon whose estate administration is granted, and conclusive evidence of the authority of the administrator to act until the letters were revoked or the order granting them set aside on appeal, "so far, at least, as to protect innocent persons acting upon the faith of them."

But this decision, notwithstanding the plausible arguments in support of it, is, as Judge Redfield remarked, (5 Am. Law Reg. 213,) "without a precedent in English or American jurisprudence;" and the responsibility for it is practically laid upon the statute of the state, which is said to require the surrogate in all cases to hear evidence and determine the question of death before granting the letters.

But in *Jochumsen* v. *S. S. Bank*, 3 Allen, 88, the supreme court of Massachusetts, under like circumstances, held that a grant of administration upon the estate of a person erroneously supposed to be dead, was void, because the jurisdiction of the probate judge was limited to the appointment of administrators upon the estates of deceased persons. And in *Griffith* v. *Frazier*, 8 Cranch, 9, the supreme court of the United States held that the appointment of an administrator by the ordinary of South Carolina upon the estate of a person, where there was an executor entitled to act, was void. Chief Justice Marshall delivered the opinion of the court, and in noticing the argument that the appointment was the judgment of an officer exercised upon a subject cognizable in his court, and therefore not void, even if erroneous, admitted its force and the difficulty of distinguishing the cases in which a court of general probate jurisdiction may be said to have acted on a subject not within its cognizance, and said: "But the difficulty of marking the precise line of distinction does not prove that no such line exists. To give the ordinary jurisdiction, a case in which by law letters of administration may issue must be brought before him.  *  *  *  But suppose administration to be granted on the estate of a person not really dead. The act, all will admit, is totally void. Yet

the ordinary must always inquire and decide whether the person whose estate is to be committed to the care of others be dead or in life. It is a branch of every cause in which letters of administration issue. Yet the decision of the ordinary that the person on whose estate he acts is dead, if the fact be otherwise, does not invest the person he may appoint with the character or powers of an administrator. The case, in truth, was not one within his jurisdiction. It was not one in which he had a right to deliberate. It was not committed to him by law."

This ruling was followed in *Kane v. Paul*, 14 Pet. 33, where it was decided that the grant of administration of an estate, where there was an executor entitled to act, was void. But when there is a case for the cognizance of the court,—that is, an estate of a deceased person without an administrator,—the court, upon the proper application, has the jurisdiction to act, and to determine every question that may arise in the course of the proceeding, including that of the residence of the deceased.

In *Fisher v. Bassett, supra,* Judge Tucker makes the distinction between the jurisdiction of the subject-matter of granting administration of estates, and the authority to proceed in a particular case. After stating that he did not consider the county court of Virginia the same as the ordinary of England, because the former was a court of record, whose judgments could not be questioned, if it had "jurisdiction of the cause," said: "And this is to be understood as having reference to jurisdiction over the subject-matter; for though it may be that the facts do not give jurisdiction over the particular case, yet if the jurisdiction extends over that class of cases the judgment cannot be questioned; for then the question of jurisdiction enters into, and becomes an essential part of, the judgment of the court. Thus, if a county court were to give judgment of death against a white man, the sheriff would have no lawful authority to execute him; or, if a court of chancery were to grant probate of a will, it would be *ipso facto* void, since that court has no jurisdiction in any case of pro-

bates. It is held void *ipso facto*, because no inquiry is necessary to ascertain its invalidity. But where the court has jurisdiction of cases *ejusdem generis*, its judgment in any case is not merely void, because its invalidity cannot appear without an inquiry into the facts; an inquiry which the court itself must be presumed to have made, and which will not, therefore, be permitted to be revived collaterally." And a parallel case, it seems to me, is this: The United States circuit court has jurisdiction of all civil cases in law and equity, of a certain value, arising between citizens of different states; and if in such a case it decides that the parties are citizens of different states, and therefore it is authorized to determine the controversy between them, its decision in this respect is conclusive, except upon appeal.

The object to be accomplished by means of giving exclusive jurisdiction to the county courts to grant administration of estates, is to provide for the due and public succession to the estates of all deceased persons, and in the exercise of this jurisdiction the residence of the deceased is merely a matter incidental, and only of importance in providing for what may be supposed to be the orderly and convenient distribution of the power among the several county courts of the state.

The argument drawn from convenience and practicability in favor of holding the judgment of a court granting administration of an estate to be conclusive as to the residence of the deceased, except upon appeal, is very suggestive and ought to have much weight. Cases are continually arising in which it is difficult to say where the last residence or inhabitancy of the deceased was. The facts upon which the decision of the question turns are often so obscure, vague, and ambiguous or contradictory, that no two courts can hardly be expected to draw the same conclusion from them. And yet its decision is a mere matter of form—relates only to the procedure—and involves no substantial right. Apart from the local convenience of parties it makes no difference what county court of the state grants the administration.

The case under consideration is a striking illustration of

the difficulty of deciding what was the last residence of a deceased person, for the purpose of granting administration upon his estate, and what useless confusion, litigation, and loss would follow if the judgment of the county judge upon such a question was open to attack collaterally, whenever and wherever any right of action or property arising out of or depending upon the correctness of such judgment was contested or called in question.

Within the 70 days immediately prior to his death, Perkins was in four counties of the state. Already administration has been granted in two of them, upon applications made under the advice of learned and careful counsel; and if I were called upon to decide of which county he was an inhabitant, at or immediately before his death, I should probably say not either of these, but Marion county. So that if the rule contended for by the libellant were to prevail, and the grant of administration be held void, in case it appears to this court that it was not made in the proper county, the conclusion might be that neither Davis nor Holmes is the legal administrator of the deceased. But I do not think the residence of the deceased is an open question in this court. In the exercise of its general jurisdiction over the estates of deceased persons, the county court of Multnomah county, in the appointment of Davis as administrator, decided that the deceased was an inhabitant of that county at the time of his death, and this decision, except upon appeal, is conclusive of the question.

The grant of administration to the libellant having been made upon an estate which was not vacant, but already vested in the administrator appointed by the court of Multnomah county, it follows that such grant is void, and the plea of *ne unques* administrator is sustained. This conclusion also derives support from the analogies of the following cases relating to the question of jurisdiction in probate courts and matters: *Grignon* v. *Astor,* 2 How. 335; *Florentine* v. *Barton,* 2 Wall. 210; *Comstock* v. *Crawford,* 3 Wall. 402; *Canjolle* v. *Ferrie,* 13 Wall. 469; *Broderick's Will,* 21 Wall. 509; *Mohr*

v. *Manierre*, 101 U. S. 417; *Dequindre* v. *Williams*, 31 Ind. 453; *Shroyer* v. *Richmond*, 16 Ohio St. 465; *Wauzer* v. *Howland*, 10 Wis. 15; *Gager* v. *Henry*, 5 Sawy. 237.

The decision upon this plea is sufficient to dispose of the case in this court; but the defendant having also contested it upon the merits, and the case being liable to an appeal, and to be considered in the appellate court upon the merits, where the conclusions of the district judge upon the evidence are to be regarded as findings of fact drawn, not merely from reading the notes of the witnesses' testimony, but a knowledge of the *locus in quo*, and a careful observation of the manner and appearance of the witnesses while undergoing examination,—circumstances which so often qualify, and sometimes contradict, their verbal statements,—I will proceed to dispose of the remaining two questions in the case: (1) Did the deceased come to his death by the wrongful act or omission of the defendant, and without substantial fault on his part? and, (2) if he did, what damages ought his administrator to recover under the statute therefor?

Upon the first point a brief statement of the facts will suffice. On the morning of November 16, 1878, the deceased, in company with his mother, brother, and two half-sisters, left Salem for Portland on the defendant's railway, which usually arrived at the depot on the east side of the Wallamet river at 4 o'clock P. M., but on this occasion was delayed at Oregon City about two hours by a freight train getting off the track. The night was dark and wet. The passengers, baggage, and mails were then transferred to the defendant's ferry-boat—the deceased and his family walking from the depot to the boat, a distance of about 125 yards. The boat was under the direction of a pilot, stationed in the pilot-house, five or six feet above the level of the deck, and about 33 feet back of the bow. There was only one light on deck, and that was an ordinary hand-lantern, carried by the watchman, the only employe on deck. The deck immediately in front of the pilot-house was about 38 feet wide, and upon either side there were railings running forward about 29 feet. Between

the forward end of these railings the deck was 20 feet across, and from there to the end of the boat—a distance of eight feet—there was no rail or guard; neither was there any chain, gate, or guard across the deck, or any like means to prevent the egress of passengers at or before landing.

On the Portland side of the river the boat landed at a pontoon about 40 feet wide, with a circular recess in the front of it about 20 feet across and 8 feet deep in the center, into which the bow of the boat was run, and then fastened by a line taken from the boat on the port or upper side at or near the end of the railing, and belayed to a kevel on the upper side of the pontoon about 10 feet from the boat, and then an apron about 12 feet in length was turned over from the front of the former on to the bow of the latter, which served as a bridge upon which wagons crossed the joint or slight opening between the boat and pontoon, while the foot passengers usually stepped off from the former on to the latter anywhere within the circle. The cabin was in the middle of the boat, running fore and aft, with a pilot-house at either end and a wagon way on either side, with a stairway at each end ascending between the house and the cabin—the one then next to the shore from the port side. While crossing the river the deceased and the family, with two or three others, occupied the cabin, which was lighted, but the light did not produce any effect forward of the pilot-house. The mail wagon, drawn by two horses, was on the port side roadway and nearly abreast of the stairway leading into the cabin. On this occasion, owing to the darkness, the boat did not make her landing at the pontoon direct, but ran in from down the stream, and at an angle of about 57 degrees with the line of its face, and went hard up against the pontoon at each end of the circular recess therein, leaving a crescent-shaped space between it and the pontoon and these points of about 18 inches in width at the center. As soon as the boat struck the pontoon the watchman stepped on to the upper side of it, sat down his lamp and made the line fast to the kevel; and at the same time most of the passengers—probably 20 or 30—who

were standing on the deck forward of the pilot-house went ashore, as was usual in the day-time, some on the upper and others on the lower side of the pontoon, where it and the boat touched or came close together, without objection or direction from any one. From the pontoon the street ascends the hill to Front street, a distance of probably 200 feet. Near the foot of the hill some hotel hacks were standing, one or two of which had lights shining towards the river, and upon the further side of Front street, and about 35 feet above the level of the river, stood a street lamp. Besides these and the watchman's lantern there were no lights at the landing or in the vicinity. On the pontoon there were a number of hotel runners making the air ring with the names and advantages of their respective houses.

Neither the defendant nor the family had ever been at Portland, or had any knowledge of the landing or its surroundings. As soon as the boat struck the pontoon, and the passengers on the deck began to go ashore, the deceased, who had reason to believe the boat was landed, went down from the cabin to go ashore. He had a sack of clothes on one arm and a valise in the other hand; and as he reached the deck and passed forward he disturbed the off horse in the mail wagon, and the animal, being skittish or vicious, jumped or kicked, whereupon the driver railed out at him, telling him with much profanity to stand back or take care, or he would get hurt. With this the deceased, who was now at the front of the pilot-house, diverged a little to the right, and saying, "I am all right," walked forward to the starboard quarter of the bow, a few feet forward of the end of the rail, and undertook to step off on to the pontoon, but struck his toe against the latter instead of stepping on it, and thereby fell into the river through the space between the pontoon and the boat, which was there from 18 inches to two feet wide, and was drowned. Upon this state of facts it is too plain for argument that the deceased came to his death by "the wrongful omission"—the negligence—of the defendant.

The defendant was a common carrier of passengers for

hire, and for their protection was subject to a very strict responsibility. Therefore, it was bound to provide for the safety of the deceased, while upon its boat and getting on shore, "so far as was practicable by the exercise of human care and foresight." *Shoemaker* v. *Kingsbury*, 12 Wall. 376. To this end, it was certainly its duty to have had its boat and landing, particularly the latter, well lighted, and to have maintained a guard or gate across the bow of the former to prevent passengers from debarking before the landing was fully made, and to have signified to the passengers in some suitable and sufficient manner—as by the ringing of a bell— when it was safe and proper to go ashore. But all these precautions were substantially omitted, and although the fact that the boat did not usually cross the river at night may in some measure excuse those in the immediate charge of the boat for the omission, it does not exonerate the defendant from the legal effect thereof.

But the defendant claims that the deceased was duly warned not to go ashore when and as he did, and that his disregard of such warning was the cause of his death, or substantially contributed to it; and also that he was intoxicated at the time of his death, and incapable of apprehending or avoiding the danger which caused the loss of his life.

Contributory negligence is a defence to this action. *The Chandos*, 4 FED. REP. 649. But the burden of proof is upon the defendant to establish it. I admit the authorities are in hopeless conflict upon this question, but in my judgment any other rule than this violates all the analogies of the law, and is practically illogical and unjust. See 2 Thomp. Neg. 1175, § 24.

The evidence in regard to the warning and intoxication comes from the witnesses of the defendant, and must be taken with many grains of allowance, besides being substantially contradicted by those of the libellant. The witnesses of the defendant, from whom this evidence comes, are its employes, or persons habitually traveling on its road in connection with the transportation of the mail, or engaged as solicitors for

hotels that receive a large share of their patronage from the travel over this road. They are evidently more or less in sympathy with the defendant or its representatives, who are persons of standing and influence in this community, while the deceased was a poor stranger without friends or influence. The circumstances to which many of them speak occurred in a crowd on the boat and the pontoon, when the deceased was utterly unknown to most of them, while the darkness and confusion was such as to prevent accurate or reliable observation or apprehension of what did take place.

Upon the question of intoxication my conclusion is that while the train was delayed at Oregon City the deceased became partially intoxicated, but not so as to render him at all helpless or unconscious, but that before he reached the ferry-boat the effect of the liquor had practically passed away. He appears to have gone back and forth on the train during the passage from Oregon City without difficulty. He also appears to have gotten down from the cars at the depot, and walked to the ferry-boat, and sat in the cabin while crossing the river, without any trouble or attracting the attention of those in his immediate presence and company. It is admitted that intoxication is evidence of contributory negligence, and in some cases may be sufficient to establish it. But it is not admitted, under the circumstances of this case, that if the deceased had been staggering drunk the defendant would not be liable for his death. The defendant received him on its boat without objection, and if he was palpably drunk it was bound to take care of him accordingly.

In *Robinson* v. *Pioche*, 5 Cal. 460, which was an action for damages sustained by the plaintiff falling into an uncovered hole, dug in the sidewalk, in front of the defendant's premises, and taken to the supreme court upon an exception to the charge in the court below, to the effect that, if the intoxication of the plaintiff was one of the causes of the injury, he could not recover, *Hydenfelt*, J., in delivering the opinion of the court for reversal, said: "If the defendants were at fault in leaving an uncovered hole in the sidewalk

of a public street, the intoxication of the plaintiff cannot excuse such gross negligence. A drunken man is as much entitled to a safe street as a sober one, and much more in need of it."

As to the warning, admitting, for the present, that the defendant might by this means excuse itself for the want of light, guard, and signal for landing, the proof is not satisfactory that any distinct warning not to go ashore was given to the deceased that he was bound to recognize, as intended for him, or as coming from any one authorized to direct or interfere with the conduct of the passengers. The objurgation of the driver of the mail wagon is claimed to have been a sufficient warning; but, apart from the fact that he was only a passenger, the fair inference from all the circumstances is that what the driver said was occasioned by and confined to the alleged interference of the deceased with his horse. The pilot, (Charles F. Jones,) who, under the circumstances, appears to be a fair witness, did call out from the pilot-house, and probably as the deceased was going forward, "to stand back." But there is no evidence that the call was particularly intended for the deceased, or if it was that he had any reason to think so, or even that he heard it. There were other persons in front of the pilot-house, also going forward, as well as the deceased. The deceased was a stranger to the boat, the place, and the manner of proceeding. He saw the great bulk of the passengers had gone off, and if he heard the call he might as well have understood it as applicable to the hotel runners on the edge of the pontoon waiting to catch the rest of the passengers. Some of the witnesses on shore also state that they cried, "Stand back," intending it for the deceased, without, however, mentioning any name. But their testimony upon this point is vague and indefinite, and upon other points where the facts are clear some of them are much mistaken. One in particular states that the boat was fastened upon the lower side of the pontoon, while there is no doubt but that it was fastened on the upper side; and that the passengers got off on the lower side, when it is

equally certain that the greater number got off on the upper side. Most of them represent the gap between the boat and pontoon, when and where the deceased went off, as from three to six feet wide, and that the boat was backing at the time. But the admitted circumstance, that the boat was made fast as soon as she touched the pontoon and remained so without slacking the line, proves that she could not have backed; and completely disproves the conjectural and reckless statements to the contrary. Besides, the pilot swears positively that he did not back the boat, but only swung her stern up stream to bring her into a right line with the pontoon; so, I infer, as to make a close connection and allow the wagons to go off. Another fact stated by one of the defendant's witnesses (P. G. Glisan) satisfactorily disposes of these extravagant statements as to distance between the boat and the pontoon, and the imputation founded upon them of recklessness on the part of the deceased in attempting to cross such a chasm. He says the deceased attempted to get off the bow of the boat just opposite where he was standing on the pontoon, and that the gap between the two was about 18 inches—just a good step across; that as the deceased approached him he called to him to "stand back," and thought to put his hand on him and hold him on the boat, but before he could do so the deceased stepped off, and as he did so struck his foot on the pontoon and fell; that as he fell the witness reached forward and caught him by the coat, but could not hold him, and he fell down into the water, some six or seven feet below. Under the circumstances any witness is very liable to be mistaken as to the width of the gap between the boat and the pontoon—particularly after the lapse of two years; but the fact that the deceased stepped from the one to the other in Glisan's immediate presence, and that he caught Perkins by the coat as he fell between them, is a matter he cannot well be mistaken about. The most probable conclusion, then, is that the space between the boat and the pontoon, when and where the deceased attempted to cross it, was about 18 inches. But it is also highly probable that it was less than this, if anything just

before the deceased reached it. When the pilot saw that the passengers on the forward part of the boat had gotten off, he commenced working his wheels to swing the stern up stream, and this naturally increased the opening on the lower side; and so it was that the deceased, unconscious of this fact as he walked forward in the comparative darkness, encountered a chasm between the boat and pontoon, in the place where others had just crossed in safety, wider than he had reason to expect or was aware of. True, the pilot, when he commenced swinging around, being aware of the opening he was making between the pontoon and the boat, called out, "Stand back." But the order was directed to nobody in particular, and coming as it did from above and behind the deceased, in a voice unknown to him, it is not likely that it was understood or recognized by him as being applicable to persons in his situation. There ought to have been some one on deck to apply and enforce the order, or some guard or gate to prevent passengers from going forward of the railing until the landing was completed; and above all there ought to have been light enough in the vicinity to have made the situation apparent to every one on board. This omission was the negligence which caused the death.

The libellant contends that the damages ought to be exemplary, and that they ought to be estimated for the sufferings of the deceased and the injury to the feelings of the survivors, as well as the pecuniary loss to his estate. The sufferings of the deceased were merely momentary, and could hardly become the subject of damages under any circumstances; nor do I think that either of these grounds of damages are within the statute. It provides "that when the death of a person is caused by the wrongful act or omission of another," under the circumstances of this case, the personal representatives of the deceased may maintain an action therefor, "and the damages therein shall not exceed $5,000, and the amount recovered, if any, shall be administered as other personal property of the deceased." The damages are a part of the general assets of the estate of the deceased, and belong

first to the creditors, and second to the next of kin, or persons among whom the law provides the present estate shall be distributed. It would, indeed, be a new way of paying old debts, if the tears and anguish of the survivors could be thus converted into assets for the payment of the creditors of the deceased.

In this case it is admitted that there are no creditors, and the deceased being a single man, without a father, his next of kin, or the distributees of his estate, under the statute of the state, are his mother, brother, and sisters, in equal parts. Oregon Laws, 547, 548, § 3, subs. 3.

Under similar statutes of other states it has been generally held that the rule upon which damages should be assessed in this class of cases is as for a pecuniary injury, and not a *solatium*, or solace for wounded feelings or mental suffering. 2 Thomp. Neg. 1289, § 90.

The nearness of the relation between the deceased and those for whose benefit the damages are claimed, and the nature and strength of the obligation of the former to care for the latter, are considered in estimating the damages, and the more distant the relation or the weaker the obligation the less they should be. The age, health, habits of industry and sobriety, and mental and physical skill of the deceased, so far as they affect his capacity for rendering useful service to others, or acquiring property, must also be considered. Under the statute the life of the deceased is valued according to his capacity and disposition to be useful—to labor and to save. The industrious, provident, and skilled are worth more to society than the indolent, improvident, and ignorant, and their death is to be compensated for accordingly. This is the law; and, as will be seen, it makes no account of sentiment or feeling; and yet, while it is administered by fallible human beings, whether on the bench or in the jury-box, the chances are that a feeling of pity for the bereaved or indignation for the wrong will creep into the estimate and swell the damages beyond the strict legal limit. Neither are the damages to be vindictive or exemplary, by way of punishment. The law

has provided for that otherwise. Whenever death ensues from the misconduct or negligence of an officer of a steam-vessel, he may be prosecuted and punished as for manslaughter. Section 5344, Rev. St.

According to the standard life tables the expectancy of life of the deceased was about 38 years. He had no trade or calling by which to earn anything save that of a common laborer, and the decided weight of the evidence is that he was indolent or inefficient, and inclined to intemperance. At both Roseburg and Salem the family were glad to accept charity from comparative strangers, although the deceased was one of them and in apparent good health. Earning as he might, if he would, $300 or $400 a year, it is not probable that he could furnish his mother more than $100 a year of it. Her age is not shown directly, but it may be inferred from the circumstances that she is between 40 and 50 years old. Her expectation of life is then about 20 years. The present value of $100 a year for 20 years is about the compensation she is theoretically entitled to for the pecuniary loss caused by the death of her son. The expectation of life in the case of the brothers and sisters is greater, indeed greater than that of the deceased; but the obligation to take care of them is less than in the case of the mother. Counting interest at the present legal rate—8 per cent.—I think $1,000 is all that ought to be recovered.

But as, in my judgment, the grant of letters to Davis was valid until avoided, and those to the libellant void, the latter cannot maintain this suit as the representative of the deceased, and therefore the libel must be dismissed, with costs.