**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jeffrey OTHERSON,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bruce BROWN, Defendant–Appellant.**

**Nos. 80–1202, 80–1203.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 17, 1980.

Decided Nov. 6, 1980.

Rehearing Denied Feb. 20, 1981.

Michael J. McCabe, San Diego, Cal., Joseph Milchen, Frank & Milchen, San Diego, Cal., for defendant–appellant.

David C. Doyle, Asst. U. S. Atty., argued, M. James Lorenz, U. S. Atty., David C. Doyle, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff–appellee.

Before PREGERSON, FERGUSON and NORRIS, Circuit Judges.

PREGERSON, Circuit Judge.

Appellants Jeffrey Otherson and Bruce Brown, United States Border Patrol agents, were tried by the court on stipulated facts and convicted of violating 18 U.S.C. § 242[1] by depriving aliens of federal rights, and of conspiring to effect such a deprivation in violation of 18 U.S.C. §§ 371 and 242.

Otherson and Brown do not deny beating aliens who had illegally entered the United States from Mexico and who had been taken into custody by the Border Patrol near San Ysidro, California. Rather, they argue on appeal that such aliens are not "inhabitants of any State, Territory, or District" and hence are not protected by 18 U.S.C. § 242. They further claim that section 242 does not apply to actions under color of federal, as opposed to state, law.

We reject both of appellants' arguments. The convictions are affirmed.

## BACKGROUND

The facts stipulated at trial reveal that on July 3, 1979, appellant Otherson was on transport duty with trainee Border Patrol agent Gino Freselli. This duty entailed picking up illegal aliens and alien smugglers apprehended by other agents and transporting the aliens in a van to a processing center.

On the morning of July 3, a Border Patrol surveillance aircraft radioed Otherson

and Freselli that an alien on the ground had directed an obscene gesture at the aircraft. Otherson and Freselli later picked up three or four aliens who had been taken into custody and drove them to the area assigned to appellant Brown. There, Otherson told Brown that one of the aliens–wearing a red shirt–was the one who had made the obscene gesture to the surveillance aircraft. Brown pulled this man from the transport van and questioned him about the gesture, but received no reply. He slapped the alien four or five times across the face, then held the man's arm on the floorboard of the van and beat his hand with a nightstick.

The alien still refused to answer questions about the obscene gesture, and Brown repeatedly slapped him across the face and struck his injured hand with the nightstick. Otherson joined in, punching the alien in the stomach. Finally, the alien was put back into the transport van and driven by Otherson and Freselli to another area, where agent Dirk Dick was on duty. Otherson told Dick that they had the alien who had "flipped off" the surveillance aircraft. Dick then slapped and punched the alien before he was taken at last to patrol headquarters.

The next day (July 4, 1979), Otherson took two aliens apprehended by him in San Ysidro to an area where Brown and agent Daniel Charest already had several illegal aliens in custody. Separating one alien from the group, Brown sat him down and slapped him five or six times across the face with an open hand. Otherson kicked another alien in the leg, hit him with his nightstick, and kicked his shoes into a canyon. The aliens were taken to sector headquarters and left there for routine deportation.

---

1. 18 U.S.C. § 242 provides:

    Whoever, *under color of any law*, statute, ordinance, regulation, or custom, willfully subjects *any inhabitant of any State, Territory, or District* to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhab-

    itant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

    (Emphasis added.)

There was no evidence as to the identities, origins, or destinations of any of the victims, nor as to the reasons for their presence in the United States.

There was evidence to indicate that appellants' abuse of aliens in their custody was part of a deliberate plan or policy. In late June or early July, Border Patrol Agent Ronald Gamiere, who apprehended the red–shirted alien, overheard Brown, Otherson, and a third agent talking. One of them had asked "Who's the designated hitter?" or "Are you the designated hitter?" or a similar question. On July 3, before Otherson drove the red–shirted alien to Brown's location, the two appellants had a radio conversation in which Brown replied "Affirm" to Otherson's question, "Are you Delta Henry?" (In one version of the phonetic alphabet code used by Border Patrol agents, "Delta Henry" is equivalent to "DH"–letters with no legitimate meaning in Border Patrol parlance.) Later on July 3, while Otherson was taking the red–shirted alien from Brown's location to Dick's, he explained to trainee Freselli that "we find it necessary to do things like this because the criminal justice system doesn't do anything to these assholes."

Otherson, Brown, Dick, and Charest were tried before a jury in November 1979 on charges of violating 18 U.S.C. §§ 371 and 242. The jury acquitted Charest, and acquitted Dick on two of the three counts against him, but deadlocked on all other counts, and a mistrial was declared as to those counts. At the conclusion of the prosecution's case, the defendants moved for judgment of acquittal on the grounds that the aliens allegedly victimized were not "inhabitant[s] of any State, Territory, or District" as required by 18 U.S.C. § 242, and that section 242 covers only actions under color of state, not federal, law. The district court denied the motion and later filed a written opinion explaining its ruling on the "inhabitant" issue. *United States v. Otherson*, 480 F.Supp. 1369 (S.D.Cal.1979).

On January 29, 1980, a two–count superseding information was filed, charging appellants Otherson and Brown with conspiring to violate 18 U.S.C. § 242 (Count One) as well as a substantive violation of section 242 (Count Two). A court trial was held that day on stipulated facts and appellants were found guilty on both counts. At this trial, appellants' earlier motion for judgment of acquittal was renewed and was again denied by the court.

## I. COLOR OF LAW

■ Appellants claim that 18 U.S.C. § 242 applies only to actions taken under color of *state* law, so that they cannot be held liable under section 242 for their actions–taken under color of federal law. This claim finds no support in the language of section 242, which imposes criminal sanctions on "*Whoever*, under color of *any* law, statute, ordinance, regulation, or custom," (emphasis added) deprives any "inhabitant" of his or her civil rights.

Moreover, the Supreme Court has indicated that section 242 extends to federal officers. In *Screws v. United States*, 325 U.S. 91, 108, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945), Justice Douglas said that in a section 242 prosecution:

> The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under "color of any law." He who acts under "color" of law may be a federal officer or a state officer. He may act under "color" of federal law or of state law.

(*See also id.* at 97 n.2, 65 S.Ct. at 1033 n.2: "[F]ederal as well as state officials would run afoul of the Act since it speaks of 'any law, statute, ordinance, regulation, or custom.'")

This circuit has in fact affirmed the conviction of a federal officer for violating section 242 (although whether the statute applied to acts under color of federal laws was not an issue raised by the defendant). *Gowdy v. United States*, 207 F.2d 730 (9th Cir. 1953).

The counterarguments that appellants raise carry little weight. First, they claim that section 242 was enacted to enforce the

Fourteenth Amendment, which applies only to the actions of the states, and should thus be interpreted to reach only actions under color of state law. Section 242, however, derives from section 2 of the Civil Rights Act of 1866, 14 Stat. 27, and thus could not possibly have been designed to enforce the Fourteenth Amendment–which was not ratified until 1868, and had not even been proposed to the states at the time the Civil Rights Act was passed.[2]

Appellants' other argument is that "under color of law" in section 242 should receive the same interpretation as the more restrictive language ("under color of any statute ... of any State or Territory") of 42 U.S.C. § 1983. Appellants seize on a remark by Representative Shellabarger, the chairman of the committee that drafted the original version of section 1983 (Act of April 20, 1871, § 1, ch. 22, 17 Stat. 13). Explaining that the new bill was modelled on section 2 of the 1866 Civil Rights Act (now section 242), the Congressman stated that that earlier act "provides a criminal proceeding in identically the same case as this one provides a civil remedy for ...." *Cong. Globe*, 42nd Cong., 1st Sess. App. 68 (1871).

Appellants are wrong to treat this remark as proving that section 242, like section 1983, must apply only to acts under color of state law. This ascribes entirely disproportionate importance to a single isolated remark by a single congressman, uttered five years after passage of the 1866 Act. Furthermore, when the remark was uttered, the Congressman's attention was focused on the new bill he was proposing rather than on the earlier act–indeed, his aim was precisely to *minimize* any differences between the two measures (since he was using the example of the earlier act to argue that his new bill was constitutional).[3]

Appellants have thus advanced no persuasive reason for confining the application of section 242 to actions under color of state law, and we decline their invitation to do so.

## II. "INHABITANT"

Appellants' more plausible claim is that the phrase "any inhabitant of any State, Territory, or District," as used in 18 U.S.C. § 242 to designate the persons protected by the act, does not include the aliens whom appellants concededly abused. This issue is one of first impression, no previous appellate decision having interpreted "inhabitant" in section 242. A review of the statute's history and purpose, however, makes it clear that appellants' claim is without merit.

Appellants would have us ignore that history and purpose, arguing that "inhabitant" has a clear, unambiguous meaning which—although they do not specify it—cannot be satisfied by mere temporary physical presence within United States territory. Yet even the cases appellants cite in their briefs exhibit conflicting interpretations of this key term. *Compare Burch v. Burch*, 195 F.2d 799, 804 (3d Cir. 1952) ("inhabitant" in Virgin Islands divorce law means "domiciliary") *with Holmes v. Oregon & California Ry. Co.*, 5 F. 523, 526 (D.Ore.1881) ("inhabitant" and "domiciliary" are not synonymous). Examination of other judicial expli-

---

**2.** It is true that the next version of section 242–section 17 of the 1870 Civil Rights Act, 16 Stat. 140–was passed after ratification of the Fourteenth Amendment. When initially introduced into the Senate as S. 365, however, that measure was described as a "bill to secure to all persons equal protection of the laws," *not* as a bill to enforce the Fourteenth Amendment. *Cong. Globe*, 41st Cong., 2d Sess. 1536 (remarks of Senator Stewart). This contrasts sharply with the other bill proposed by the same senator, S. 114, "to enforce the fourteenth article of amendment ... in regard to holding office." *Id.* at 3480. And the 1870 act as finally passed does not refer to the Four-

teenth Amendment in its title. Act of May 31, 1870, ch. 114, 16 Stat. 140.

**3.** Appellants also rely on the Supreme Court's observation that " 'Under color' of law means the same thing in § 242 that it does in ... § 1983...." *United States v. Price*, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 1157 n.7, 16 L.Ed.2d 267 (1966). Yet the Court was merely explaining that under section 242, as under section 1983, a private individual can act "under color" of law if he acts in concert with the government or its agents. Nothing was said as to *which* law, state or federal, one must be acting "under color" of.

cations of "inhabitant" reveals a host of such disagreements, belying appellants' claim that the word has but one plain meaning.[4]

The language of section 242[5] makes it immediately evident that "inhabitant" must include at least some aliens. Otherwise, it would be pointless for that statute to criminalize discrimination against an inhabitant "on account of such inhabitant being an alien." Nevertheless, it might be argued that only *resident* aliens, or only aliens *lawfully present*, are protected by section 242.[6] The ambiguity of "inhabitant" makes it appropriate to look to the legislative history of the statute to determine its scope. *United Shoe Workers v. Bedell*, 506 F.2d 174, 179 (D.C.Cir.1974).

4. Thus, courts interpreting venue statutes have on occasion treated "inhabitant," "resident," and "citizen" as equivalent in meaning. *See, e.g., Standard Stoker Co. v. Lower*, 46 F.2d 678, 683 (D.Md.1931) (treating the equivalence as "well settled"). Other courts flatly disagree: "The statutory criterion is residence, not citizenship. The terms are not synonymous." *Arley v. United Pacific Ins. Co.*, 379 F.2d 183, 185 n.1 (9th Cir. 1967), *cert. denied*, 390 U.S. 950, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968). The same disagreement has appeared in cases construing residency requirements for divorce actions. A Texas court declared that "inhabitant," "resident," and "citizen," as used in that state's divorce law, had substantially the same meaning, *Hogue v. Hogue*, 242 S.W.2d 673 (Tex.Civ.App.1951), while the Iowa Supreme Court insisted that the same terms "are not necessarily coextensive, coexistent, or synonymous." *Harris v. Harris*, 205 Iowa 108, 215 N.W. 661, 663 (1927).

5. *See* note 1 *supra.*

6. Appellants never make clear which of these arguments they mean to rely upon. At oral argument their counsel conceded that their interpretation of section 242 would exclude from that statute's protection even tourists lawfully but temporarily present in this country. This implies that it was the victims' transitory presence, rather than their illegal status, which appellants believe bars a section 242 conviction. Yet appellants' analysis of section 242's history focuses on arguing that the statute was enacted to protect *legal* immigrants to the United States.

7. Sections 1 and 2 of the 1866 Civil Rights Act, 14 Stat. 27:

What is now section 242 derives from section 2 of the 1866 Civil Rights Act, Act of April 9, 1866, ch. 31, 14 Stat. 27. *United States v. Williams*, 341 U.S. 70, 73–74, 83, 71 S.Ct. 581, 582–583, 588, 95 L.Ed. 758 (1951). A bill designed to reenact that statute, with important modifications, was introduced into the Senate in 1870 as S. 365. *Cong. Globe*, 41st Cong., 2d Sess. 1536 (1870) (remarks of Senator Stewart). Ultimately, this bill was attached as an amendment to a pending bill to enforce the Fifteenth Amendment, *id.* at 3480, and in that form was enacted as part of the Act of May 31, 1870, ch. 114, 16 Stat. 140. In that statute, the precursor of section 242 was section 17. The text of these 1866 and 1870 enactments is set out in the margin;[7] their text and

*Sec. 1.* [A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; *and such citizens*, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

*Sec. 2.* [A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, *any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act*, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.
(Emphasis added.)
   Sections 16 and 17 of the 1870 Act, 16 Stat. 140:

legislative history make it clear that whereas the 1866 statute used "inhabitant" to denote only United States citizens, the 1870 Act extended "inhabitant" to include "all persons within the jurisdiction of the United States."

Section 2 of the 1866 Civil Rights Act, according to its proponent, Senator Trumbull, was an enforcement provision designed "to give effect to what are declared to be the rights of all persons in the first section." *Cong. Globe*, 39th Cong., 1st Sess. 474 (1866). Thus it should be read in conjunction with that first section. When the act was first introduced into the Senate, both sections contained the word "inhabitant." Section 1 would have given to "the inhabitants of every race and color" equal rights to make and enforce contracts, maintain lawsuits, and hold and convey property. Section 2 of the bill made it a misdemeanor to "subject . . . any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act." *Id.* at 211 (remarks of Senator Trumbull).

The reference to "inhabitants" in section 1 of the bill was changed in the House of Representatives "to confine the operation of this bill to citizens of the United States, instead of extending it to the inhabitants of the several States, as there seems to be some doubt concerning the power of Congress to extend this protection to such inhabitants as are not citizens." *Cong. Globe*, 39th Cong., 1st Sess. 1115 (1866) (remarks of Representative Wilson). As amended, sec-

tion 1 first made all persons born in the United States citizens, and then declared that "such citizens, of every race and color," were to have the equal right to make contracts, sue, and hold property. Strangely, section 2 was not similarly amended, and continued to protect "inhabitants." However, since it protected them against "the deprivation of any right secured or protected *by this act*," (emphasis added) and since the act, with section 1 amended, conferred rights only on citizens, it is reasonable to assume that the failure to amend section 2 was an oversight and that "inhabitant" in that section really meant "citizen."

This assumption is strengthened by the way the bill's chief sponsor in the House defended the constitutionality of section 2 as if it applied only to citizens:

If *citizens* of the United States, as such, are entitled to possess and enjoy the great fundamental civil rights which it is the true office of Government to protect . . . we must of necessity be clothed with the power to insure to each and every *citizen* these things which belong to him as a constituent member of the great national family.

*Cong. Globe*, 39th Cong., 1st Sess. 1118 (1866) (remarks of Representative Wilson) (emphasis added). Moreover, Representative Bingham, speaking in opposition to the proposed statute, stated: "Mr. Speaker, the word 'inhabitant' is printed in the second section in mistake for 'citizen.' I say this

---

*Sec. 16. [A]ll persons within the jurisdiction of the United States* shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law

of any State in conflict with this provision is hereby declared null and void.

*Sec. 17.* [A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, *any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act,* or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

(Emphasis added.)

upon the suggestion of the chairman of the committee." [8]  *Id.* at 1292.

Thus the internal structure of the 1866 Act, as well as the remarks of both supporters and opponents, indicates that the "inhabitants" to whom section 2 was intended to afford protection were precisely those persons to whom section 1 extended substantive rights–United States citizens.

In 1870, sections 1 and 2 of the 1866 Civil Rights Act were reenacted with a number of changes as sections 16 and 17 of the Act of May 31, 1870, ch. 114, 16 Stat. 140; the remaining provisions of the earlier statute were incorporated by reference into section 18 of the 1870 Act. Section 16, like section 1 of the 1866 Act, contains a grant of substantive rights. But instead of conferring these rights on "citizens," the 1870 Act says that "all persons within the jurisdiction of the United States" are to have these equal civil rights.

The relationship between sections 16 and 17 suggests that "inhabitant" in section 17 is meant to include anyone, alien or citizen, within the jurisdiction of the United States. Section 17, designed to enforce section 16's grant of substantive rights, penalizes "deprivation of any right secured or protected by the last preceding section of this act." The grant of substantive rights in section 16 is made to "all persons within the jurisdiction of the United States." Since the 1866 Act had used "inhabitant" to denote citizens–those on whom it conferred substantive rights–while the 1870 Act confers those rights on a much broader class, one can infer that "inhabitant" in the 1870 Act refers to that expanded class: all persons present within the jurisdiction of the United States. Otherwise, section 17 would protect only a subclass of those to whom section 16 granted substantive rights–an anomaly contrary to the rule that provisions of a single act should be construed in as harmonious a fashion as possible.[9]  *Wein-*

*berger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973). Here, the purpose of the statute is to secure certain important civil rights to all persons within the jurisdiction of the United States. Section 16 grants these rights, and section 17 enforces that grant by criminalizing their deprivation. Reading the enforcement section as coextensive with the grant of substantive rights best promotes the statutory purpose of protecting those rights.

This interpretation is strengthened by remarks made by the chief proponent of reenacting and broadening the 1866 Act, Senator Stewart of Nevada. Explaining S. 365– his initial bill to reenact the 1866 Act–Stewart said:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. That is all there is in the bill.

*Cong. Globe,* 41st Cong., 2d Sess. 1536 (1870). The Senator further explained: "The civil rights bill had several other things applying to citizens of the United States. This simply extends to foreigners, not citizens, the protection of our laws where the State laws deny them the equal civil rights enumerated in the first section." *Id.*

Finally, we note that appellants' interpretation would hamper achievement of the statute's purpose. Senator Stewart's remarks reveal that the 1870 Act was intended to safeguard the legal rights of aliens present in this country. As the district court aptly noted, interpreting "inhabitant"

---

**8.**  *I. e.,* Representative Wilson, chairman of the House Judiciary Committee, which had referred the bill to the full House.

**9.**  "The presumption is that the lawmaker has a definite purpose in every enactment and has

adapted and formulated the subsidiary provisions in harmony with that purpose . . . ." 2A *Sutherland, Statutes and Statutory Construction* § 46.05 (4th ed. C.D. Sands 1973).

to cover only certain of such aliens would frustrate this purpose: "If the prosecution were forced to prove the circumstances of each victim, the government would almost never be able to establish its case, as the aliens could easily be deported long before an investigation into their mistreatment could begin." *United States v. Otherson*, 480 F.Supp. 1369, 1374 (S.D.Cal.1979). Appellants' equation of "inhabitant" with "domiciliary"[10] would necessitate, in each case, complex and detailed factual inquiries to determine the precise intent with which the aliens were present in this country.[11] Innumerable line–drawing subtleties would confound efforts to enforce the statute.[12] And, as the Supreme Court has warned, "we cannot, in the absence of an unmistakable directive, construe [a statute] in a manner which runs counter to the broad goals which Congress intended it to effectuate." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968).

█ Thus, the language and structure of the 1870 Act, the remarks of its sponsor, and the policy of interpreting statutes so as to effectuate rather than frustrate their purpose all suggest strongly that "inhabitant" as used in the act included any person present within the jurisdiction of the United States. None of the successive changes that have transformed section 17 of the

1870 Act into the modern 18 U.S.C. § 242 have altered this meaning.[13] Hence, "inhabitant" as used in section 242 must likewise include all persons within United States jurisdiction–in particular, the aliens whom appellants admit beating and abusing.

The arguments appellants offer to avoid this conclusion are strained and unconvincing. First, they stress the difference in wording of sections 16 and 17 of the 1870 Act. The former confers substantive rights on "all persons within the jurisdiction of the United States" while the latter protects "any inhabitant of any State or Territory." Appellants argue that Congress's use of contrasting expressions indicates its intent that the sections apply to different classes of people.

This argument ascribes too much conscious design to the precise wording of the statute. Justice Frankfurter, discussing *inter alia* section 242, has remarked that:

The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post–war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. The sections before us are no exception. Although enacted together, they were proposed by different sponsors and

**10.** This is an equation that appellants endorsed in their briefs but repudiated in oral argument, leaving it quite unclear just why they *do* think "inhabitant" cannot include persons such as those victimized here. *See* note 6 *supra*.

**11.** "It is well established that domicile entails not only residence in fact, but also *intent to make that place of residence one's home.* It is often necessary to examine the entire course of a person's conduct in order to draw the necessary inferences as to the relevant intent." *Bache Halsey Stuart Inc. v. Namm*, 446 F.Supp. 692, 694 (S.D.N.Y.1978) (emphasis in original).

**12.** *E.g.*, would an illegal entrant alien waiting at a "drophouse"–possibly for a week or two– while transportation to the East Coast is arranged count as an "inhabitant" under a narrow definition requiring actual residence? What about an illegal alien who moves into a friend's apartment? Would it depend on how long he stays, whether he contributes rent

money, or whether he intends to stay permanently? Suppose he works a year in the U.S., saves money, and is en route back to Mexico when apprehended and beaten?

**13.** Section 17 of the 1870 Act became, successively, section 5510 of the Revised Statutes of 1874–78, section 20 of the Criminal Code of 1909, 35 Stat. 1092, section 52 of the United States Code of 1926, 44 Stat. 462, and section 242 of Title 18 of the United States Code as revised in 1948; the provision for special penalties when death results was added by Pub.L. 90–284, Title I, § 103(b), 82 Stat. 75. None of these changes affected the use of the term "inhabitant," and appellants have made no claim that any of these revisions furnishes evidence that "inhabitant" does not include all persons present in the United States. Hence it is unnecessary to consider these revisions in detail.

hastily adopted. They received little attention in debate.

*United States v. Williams*, 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758 (1951). Indeed, after the Senate passed the 1870 act, some Senators complained that they had not even realized it contained the sections revising and reenacting the 1866 Act. *Cong. Globe*, 41st Cong., 2d Sess. 3700–03 (1870) (remarks of Senators Casserly and Thurman). Appellants ignore the evidence, discussed previously, that the use of "inhabitant" in section 17 of the 1870 Act, far from a deliberate choice, was a mere carry-over from its inadvertent retention in section 2 of the 1866 Act after section 1 had been amended. They also make no attempt to explain what possible motive Congress could have had for granting rights to everyone within United States jurisdiction yet shielding only some of those persons from violation of the granted rights.[14]

Appellants next note that a primary goal of the 1870 Act was to protect immigrant Chinese laborers from the discrimination then rampant in California. They seize on certain remarks on this subject by the act's sponsor, Senator Stewart, who desired to "protect those industrious, helpless people *whom we have invited to our shores*" and who rhetorically asked whether "*while the Chinese are here under our laws* . . . Congress ought not to pass a law to give them protection." (Emphasis added.) Appellants claim that the emphasized language indicates Senator Stewart's intention that his bill apply only to aliens present pursuant to invitation–*i. e.*, legally.

This is a distorted approach to legislative history.[15] While it is undeniable that the desire to assist the Chinese immigrants weighed heavily with Senator Stewart, and that these immigrants were present in the United States "legally," this does not mean that the resulting act was intended *solely* to protect legal immigrants. One might just as well conclude that it was intended solely to protect Chinese immigrants. Senator Stewart himself insisted that "They [the Chinese], *or any other aliens, who may come here* are entitled to that [equal] protection." *Cong. Globe*, 41st Cong., 2d Sess. 3658 (1870) (emphasis added). And he described his bill as protecting "*all* persons who are in the United States," "*all* persons within the jurisdiction of the United States," not merely those present "legally." *Id.* at 1536 (emphasis added).

Indeed, in 1870 immigration to the United States was unrestricted–"all were free to come"–and thus there were no "illegal aliens." *1 C. Gordon & H. Rosenfield, Immigration Law and Procedure* § 1.2a. The earliest restriction, excluding convicts and prostitutes, was not enacted until 1875, and the first general immigration law was passed only in 1882. *Id.*, § 1.2b. This makes it impossible to believe that Congress in 1870 could have intended its statute to apply only to "legal" immigrants.

Finally, appellants rely on the rule that "ambiguity concerning the ambit of crimi-

---

**14.** Similar objections apply to appellants' comparison of the language of section 17 of the 1870 Act with that of section 1 of the Act of April 20, 1871, ch. 22, 17 Stat. 13–the ancestor of the modern 42 U.S.C. § 1983–creating a civil cause of action for violation of civil rights. The latter act explicitly protects "any person within the jurisdiction of the United States," not "any inhabitant," and appellants argue that both statutes, passed by the same Congress, would surely have contained consistent language had Congress intended them to protect the same persons. Here again appellants place too much weight on adventitious differences in phrasing. Indeed, this argument is weaker than the previous one, since it rests on comparing language in statutes enacted at different times, rather than in different sections of one act.

**15.** It is also a distortion of Senator Stewart's meaning. He spoke of the Chinese as "people whom we have invited to our shores" *not* because they were present lawfully, but because their ability to immigrate to this country was guaranteed by a treaty. Thus, immediately after the quoted words, he went on to speak of "the infamy that rests upon this nation for having invited the Asiatics to come here, having made treaties for their protection, and then allowed a State in this Union to . . . place upon them unjust and cruel burdens. . . ." *Cong. Globe*, 41st Cong., 2d Sess. 3807 (1870). In earlier debate, he had stated: "We are inviting to our shores, or allowing them to come, Asiatics. We have got a treaty allowing them to come." *Id.* at 3658.

nal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). They claim that if "inhabitant" as used in section 242 is found to be ambiguous, it should be given the narrow interpretation (excluding the aliens victimized here) favorable to appellants.

■ This argument is not well taken. For one thing, the rule of lenity has little independent force; it cannot substitute for common sense, legislative history, and the policy underlying a statute. *United States v. Standard Oil Co.*, 384 U.S. 224, 225, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); *United States v. Healy*, 376 U.S. 75, 82, 84 S.Ct. 553, 557, 11 L.Ed.2d 527 (1964). It can tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose, and legislative history leave its meaning genuinely in doubt. No such doubt exists as to the proper interpretation of section 242.

■ The rule of lenity does not require courts to give criminal statutes their narrowest possible interpretation. *United States v. Bramblett*, 348 U.S. 503, 509–10, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955); *United States v. Stettmeier*, 465 F.2d 436, 437 (9th Cir. 1972) (per curiam). Indeed, disputed words or phrases in criminal laws have in many instances been interpreted broadly, defeating defendants' claims. *See, e. g., Huddleston v. United States*, 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) ("acquisition" of firearm held to include redemption from pawnshop); *United States v. Cook*, 384 U.S. 257, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966) (statute penalizing embezzlement from common carrier "firm" covers employees of individual doing business as common carrier).

Finally, the chief purpose of the rule of lenity is to ensure that persons have fair warning as to what conduct is criminal. "[I]t is rooted in fundamental principles of due process, which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979); *accord, Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 375, 93 S.Ct. 1652, 1663, 36 L.Ed.2d 318 (1973). In the present case, appellants slapped, beat, and kicked defenseless persons in federal custody. It cannot reasonably be claimed that they believed these actions were lawful, or that they had no fair warning that their conduct could subject them to criminal penalties.[16]

## CONCLUSION

Appellants have failed to sustain either of their legal challenges to their convictions. 18 U.S.C. § 242 does apply to actions of a federal officer taken under color of federal law. And the term "inhabitant" as used in section 242 does include all persons, without exception, present within the jurisdiction of the United States.

The message of this case is clear. So long as the American flag flies over United States courthouses, the federal courts and the federal justice system stand as bulwarks to assure that every human being within the jurisdiction of the United States shall be treated humanely and dealt with in accordance with due process of law by those entrusted with the power to enforce the law.

The judgment of the district court is AFFIRMED.

---

16. For the same reason, appellants could not successfully claim that their conviction under section 242 violated due process notice requirements. "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal . . . ." *Buckley v. Valeo*, 424 U.S. 1, 77, 96 S.Ct. 612, 662, 46 L.Ed.2d 659 (1976). Here, appellants can hardly have supposed their brand of vigilante "justice" to be legal. As Justice Rutledge observed in reject-

ing a notice challenge to an earlier version of § 242: "[Defendants] were not puzzled to know for what they were indicted . . . . They simply misconceived that the victim had no federal rights and that what they had done was not a crime within the federal power to penalize. That kind of error relieves no one from penalty." *Screws v. United States*, 325 U.S. 91, 128, 65 S.Ct. 1031, 1048, 89 L.Ed. 1495 (1945) (Rutledge, J., concurring) (footnote omitted).

NORRIS, Circuit Judge, concurring.

The question raised by this appeal is whether the appellants' conduct constituted a violation of 18 U.S.C. § 242. I concur in the result on the basis of the analysis in Judge Pregerson's opinion that the statutory language, when viewed in light of the legislative history, leaves no doubt that Congress intended to make the conduct of the appellants a federal crime.