BEDROC LIMITED, L.L.C., a Nevada Limited Liability Company, and Earl Williams, an individual, Plaintiffs/ Counterdefendants,

v.

The UNITED STATES of America; Bruce Babbit, Secretary of the Interior; United States Department of the Interior; Bureau of Land Management; and Curtis L. Tucker, Area Manager, Caliente Resource Area, Bureau of Land Management, Defendants/ Counterclaimants.

No. CV–S–98–01012–PMP (LRL).

United States District Court,
D. Nevada.

May 24, 1999.

Karen Budd–Falen, L. Eric Lundgren, Budd–Falen Law Offices, P.C., Cheyenne, WY, Douglas Malan, Deaner, Deaner, Scann & Malan, Las Vegas, NV, for plaintiffs.

Blaine T. Welsh, Assistant United States Attorney, United States Attorney's Office, Las Vegas, NV, for defendants.

*ORDER*

PRO, District Judge.

Presently before this Court is Plaintiffs' Bedroc Limited, L.L.C.'s ("Bedroc") and Earl Williams' ("Williams") Motion for Summary Judgment (Doc. # 16), filed on February 1, 1999. In connection with this initial submission, Bedroc and Williams have also provided: (1) a Notice of Filing Facsimile Declaration (Doc. # 17) (filed on February 1, 1999); (2) a Notice of Filing Unsigned Declaration (Doc. # 19) (filed on February 1, 1999); (3) Errata to Memorandum in Support of Motion for Summary Judgment (Doc. # 21) (filed on February 3, 1999); and (4) a Notice of Filing Original Declarations (Doc. # 22) (filed on February 8, 1999). Defendants United States of America, Interior Secretary Bruce Babbit, the Department of the Interior, the Bureau of Land Management ("BLM"), and BLM Area Manager Curtis L. Tucker (hereinafter labeled collectively as the "U.S. Government") filed a Brief in Support of Mineral Ownership and Opposition (Doc. # 26) on March 18, 1999.

The U.S. Government also filed a Brief on Mineral Ownership (Doc. # 20) on February 1, 1999. Bedroc and Williams filed a Response (Doc. # 27) on March 18, 1999.

## I. INTRODUCTION

The development, exploitation and preservation of public land resources has played a key role in the development of the State of Nevada. In the course of this nation's history, Congress has passed literally thousands of public land laws in order to foster economic and social growth. *See Arthur R. Wallace,* 30 IBLA 239, 240 (1977). Many of these laws have become obsolete with the evolution of our republic. Today, this Court must discern the ambit of one of these now-defunct statutes, the Pittman Underground Water Act, in order to determine whether Defendant U.S. Government or Plaintiffs Bedroc and Williams have ownership rights to deposits of sand and gravel located on formerly public lands. After examining the Act's legislative history and utilizing other tools of statutory construction, this Court concludes that the deposits are the reserved property of the United States.

## II. BACKGROUND

### A. The Pittman Underground Water Act

In 1910, the population of the State of Nevada numbered only 81,875. *See* H.R.Rep. No. 63–1418, at 2 (1915). One of the main impediments to population growth was a lack of artesian water sources. *See id.* The Pittman Underground Water Act, 43 U.S.C.A. §§ 351–360 (West 1964), repealed by Pub.L. No. 88–417, § 1, 78 Stat. 389 (1964) (hereinafter the "Pittman Act"), was specifically designed to address this problem. The Secretary of the Interior was authorized to issue permits, not to exceed two years, providing the exclusive right "to drill or otherwise explore for water beneath the surface ... of unreserved, unappropriated, nonmineral, nontimbered public lands of the United States in the State of Nevada

not known to be susceptible of successful irrigation at a reasonable cost from any known source of water supply." Pittman Act § 1.

To acquire such permits, potential settlers were required to file affidavits averring that their applications were made "honestly and in good faith ... for the purpose of reclamation and cultivation." Pittman Act § 2. Upon the applicant's successful demonstration that he or she could irrigate at least twenty acres of the permitted parcel, the applicant would receive a land patent of up to 640 acres as a reward. *See* Pittman Act § 5. However, any acquired land was controlled by the following mineral reservation:

> [A]ll entries made and patents issued under the provisions of this Act shall be subject to and contain a reservation to the United States of all the coal and other valuable minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same. The coal and other valuable mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal.

Pittman Act § 8.

From its inception, the legislation was acknowledged as being somewhat experimental. *See* 58 Cong.Rec. H6468, H6468 (1919) (statements of Rep. Evans). Ultimately, the experiment was labeled a failure. In 1964, Congress repealed the Pittman Act due to its inability to promote agricultural development in Nevada. *See* S.Rep. No. 88–1282, at 1 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2699, 2699 (noting creation of only negligible amounts of crop land and "ill-advised" applications).

### B. Factual and Procedural Background

On March 12, 1940, Bedroc's and Williams' predecessor-in-interest acquired the patent to the surface estate of 560 acres of land, located in Lincoln County, Nevada, under the Pittman Act. (*See* Pat-ent, attached as Ex. 1 to Defs.' Brief on Mineral Ownership, Doc. # 20.) Before receiving this patent, the Director of the Geological Survey certified the land as nonmineral in nature and recommended its disposal under the Pittman Act. (*See* Letter from Director, U.S. Geological Survey, to the Secretary of the Interior, attached as Ex. 9, Pls.' Mot. for S.J., Doc. # 16.) This nonmineral designation was approved on behalf of the Secretary on October 5, 1934. (*See* Approval Notation, dated Oct. 5, 1934, by First Assist. Secretary of the Interior T.A. Walters on Letter from Director, U.S. Geological Survey, to the Secretary of the Interior, at 2.)

After a number of changes in ownership, the tract of real property was purchased by Williams on February 24, 1993. Soon thereafter, Williams began to extract sand and gravel from deposits on his land. (*See* Patricia Richards Decl., attached as Ex. 5 to Pls.' Mot. for S.J., Doc. # 16.) These deposits became the focus of an ownership dispute between the Department of the Interior and Bedroc and Williams.

The BLM, a division of the Department of the Interior, issued to Williams two notices of trespass on March 26, 1993, and April 1, 1993, for the removal and sale of the sand and gravel. The BLM issued these notices according to its interpretation of the Pittman Act's reservation of "valuable minerals" as including deposits of such substances. After corresponding with Williams, the BLM issued a Decision on April 23, 1993, finding that Williams had removed and sold federally-owned minerals without the benefit of a mineral contract and was liable for future damages under 43 C.F.R. § 9230.0–7. (*See* Decision at 1, attached as Ex. 4 to Defs.' Brief on Mineral Ownership, Doc. # 20.) The BLM based its decision, in part, on *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), where the Supreme Court found that sand and gravel were minerals reserved to the United States under the Stock–Raising Homestead Act of 1916, ch. 9, 39 Stat. 862,

*repealed by* Federal Land Policy and Management Act of 1976, Pub.L. 94–579, § 102, 90 Stat. 2744 (1976). (*See* Decision at 1.)

The BLM Decision against Williams was upheld on appeal by the Interior Board of Land Appeals (the "IBLA"), albeit on the basis of the Pittman Act's legislative history and intent, not by analogy to the Stock–Raising Homestead Act. Williams now seeks a determination from this Court that the IBLA and BLM proceedings constituted "arbitrary and capricious" proceedings in violation of section 1(e) of the Administrative Procedures Act, 5 U.S.C. § 706, due to their erroneous interpretation of the disputed sand and gravel as "valuable minerals" reserved to the United States under the Pittman Act. (*See* Complaint, Doc. # 1.)

In the midst of these proceedings, Bedroc acquired the real property from Williams on July 27, 1995. Bedroc continued the removal and sale of the extant sand and gravel deposits. The Department of the Interior similarly asserted claims to these deposits against Bedroc as well. After some litigation, Bedroc was permitted to continue to remove these deposits pursuant to a stipulation with the Department of the Interior. (*See* Stipulation, attached as Ex. 7 to Pls.' Mot. for S.J., Doc. # 20.) The Stipulation, *inter alia*, required Bedroc to deposit a sum of money for each cubic yard of sand or gravel removed, pending final resolution of the title dispute to the deposits. (*See id.*) Bedroc now seeks summary judgment quieting title to the disputed real property and its sand and gravel deposits. (*See* Complaint, Doc. # 1.)

Bedroc's and Williams' claims were joined pursuant to Federal Rule of Civil Procedure 20. *See Desert Empire Bank v. Insurance Co. of North America*, 623 F.2d 1371, 1375 (9th Cir.1980). In opposing Bedroc's and Williams' claims, the U.S. Government has counter-moved for summary adjudication, seeking a declaration that it is the reserved owner of the deposits. (*See* Defs.' Brief & Opp., Doc. # 26.)

## III. DISCUSSION

Determination of the parties' ownership rights to the sand and gravel deposits depends upon whether the disputed sand and gravel constitute "valuable minerals" reserved to the U.S. Government under the Pittman Act. Resolution of this question requires this Court to determine: (1) whether sand and gravel constituted "minerals" for purposes of the Pittman Act; (2) if so, whether they constituted "valuable" minerals; and (3) what effect, if any, the U.S. Geological Survey's nonmineral certification had on the status of the disputed resources.

When determining the meaning of a statute, a federal court must first look to the plain and ordinary meaning of both the disputed language and the statute as a whole. *See Craft v. Campbell Soup Co.*, 161 F.3d 1199, 1201 (9th Cir.1998). But when the text is ambiguous, the court should examine the statute's legislative history and employ other extrinsic aids in order to divine the statute's meaning. *See Moyle v. Director, Office of Workers' Compensation Programs*, 147 F.3d 1116, 1120 (9th Cir.1998).

The matter before this Court defies simple resolution through a plain meaning analysis. The parties vigorously disagree as to whether the term "mineral" commonly includes substances such as sand and gravel. In contexts outside the Pittman Act, there has been considerable dispute as to this very issue. *Compare Webster's New World College Dictionary* 863 (3d ed.1996) (defining "mineral" as "an inorganic substance occurring naturally in the earth and having a consistent and distinctive set of physical properties ... [or] any substance that is neither vegetable nor animal") *with Miller Land & Mineral Co. v. State Highway Comm'n of Wyoming*, 757 P.2d 1001, 1003–04 (Wyo.1988) (sand and gravel not "minerals" within natural meaning of word); *Heinatz v. Allen*, 147 Tex. 512, 217 S.W.2d 994, 997 (1949) (same).

Resort to the Pittman Act's legislative history and other tools of statutory construction, however, is more informative. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court held that where a statute is silent or ambiguous as to a specific issue, a federal court must defer to a permissible agency interpretation unless it is arbitrary or capricious. In this light, the Department of the Interior's characterization of sand and gravel as "minerals" (*see Earl Williams*, 140 IBLA 295, 302–14 (1997)) under the Pittman Act withstands scrutiny. The Department of the Interior has tracked national sand and gravel production as part of its annual mineral report since at least 1914 (viz., before the promulgation of the Pittman Act). (*See* U.S. Geological Survey, Mineral Resources of the United States 271–83 (1914–19), attached as Exs. 1–6 to Def.'s Opp., Doc. # 26). Moreover, notwithstanding Bedroc's and Williams' reliance on interpretations of written instruments between private parties, *see e.g. Atwood v. Rodman,* 355 S.W.2d 206 (Tex.Civ. App.1962, writ refused n.r.e.); *Farrell v. Sayre*, 129 Colo. 368, 270 P.2d 190 (1954), federal courts have held that common varieties of gravel are "minerals" for purposes of pre–1955 federal mining claims and the Stock–Raising and Homestead Act of 1916. *See Watt*, 462 U.S. 36, 57–58, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) and cases cited therein.

■ More problematic, however, is the question of whether the sand and gravel at issue constitute "valuable" minerals for purposes of the Pittman Act. Bedroc and Williams argue that the Pittman Act's term "valuable minerals" should be construed in the same fashion as the term "valuable mineral deposits" in the Mining Law of 1872. *See* 30 U.S.C. § 22. Under the Mining Law, mineral deposits are "valuable" only if they are reasonably marketable or profitable at the time of a patent's issuance. *See United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); *Lara v. Secretary of*

*Interior of United States,* 820 F.2d 1535, 1541 (9th Cir.1987). Thus, Bedroc and Williams argue that the sand and gravel deposits on the property were never reserved to the government, since they could not have been profitably mined and marketed in the 1940's (i.e. immediately after the predecessor-in-interest's receipt of a Final Certificate on August 29, 1939). (*See* Pls.' Mot. for S.J., Doc. # 16, Ex. 1.) This is an argument that this Court declines to accept.

■ It is true that, as Bedroc and Williams contend, "where words are employed in an act which had at the time a well-known meaning in the law, they are used in that sense unless the context requires the contrary." *See Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939) (citation omitted). But this Court agrees with the Interior Board of Land Appeal insofar as it held that reference to a single analogous, but unrelated, statute is an unreliable method of divining legislative intent. *See Williams*, 140 IBLA at 303 (citing Norman J. Singer, 2B Sutherland Stat. Const. § 53.05 (5th ed.1992)). Such references are of significant value only where "analogy is made to several statutes or a general course of legislation." *Id.* When plentiful sister statutes are absent, as in the case *sub judice*, it is best to examine the legislative history and purpose of the disputed statute to discern Congressional intent. *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n. 3 (9th Cir.1995); *Singer, supra*, § 46.07.

Perusal of the Pittman Act's legislative history reveals that Congress did not contemplate the fee simple conveyance of substances such as sand and gravel. First, Congress specifically stated that the Pittman Act's purpose was "to encourage the exploration for and development of artesian and subsurface waters in the State of Nevada." *See* H.R.Rep. No. 66–286, at 1 (1919). Contrary to the Bedroc's and Williams' assertions, however, such activity was meant to reward the husbandry of

livestock and crops. *See id.* (stating that bill would remedy prior retardation of "agricultural development in Nevada"); Letter from Alexander T. Vogelsang, Acting Secretary, Department of the Interior, to Senator Reed Smoot, Chairman, Committee on Public Lands (June 24, 1919), *printed in* S.Rep. No. 66–66, at 2 (1919) (stating that bill would ensure that land is "made available for agricultural purposes"). Indeed, Congress repealed the Act forty years later specifically for its paltry creation of only "three economic farm units." *See* S.Rep. No. 88–1282, at 1 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2699, 2699.

Secondly, the Pittman Act's sponsor, Senator Pittman of Nevada, explicitly stated that the bill was intended to reserve all mineral rights to the Government. The remarks of the sponsor of language ultimately promulgated into law are an authoritative guide to a statute's construction. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *United States v. Otherson,* 637 F.2d 1276, 1283 (9th Cir. 1980). During an exchange with Senator Thomas of Colorado, Senator Pittman explained that the reservation clause was meant to reserve to the United States the full spectrum of minerals:

> Mr. THOMAS. Mr. President, section 6 of the proposed bill provides for the reservation from the operating clause of the patent of "all the coal and other valuable minerals in the lands so entered and patented." I wish to inquire of the Senator from Nevada whether that reservation is broad enough, or is intended to be broad enough, to include veins of gold, silver, lead, and other metalliferous deposits?
>
> Mr. PITTMAN. In line 25, at the bottom of page 3, in section 6, the bill says:
>
> The coal and other valuable mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal.

> Mr. THOMAS. If it does include that class of deposits, I can foresee a great deal of complication and trouble arising from the attempt to prospect for valuable mineral deposits on these lands under the mining act of 1872.... I believe it would be very much better for the Government, for the prospector, and for the operator under the provisions of this bill, if there were no such exception; and I shall therefore offer an amendment to eliminate section 6 from the bill.
>
> Mr. PITTMAN. Mr. President, before the Senator does that, I trust that he will consider the matter for a minute. This bill, as it was originally prepared by me, did not contain that reservation. When a similar bill was introduced in the House of Representatives, at my request, it met with serious opposition on the very ground that it might be used for the purpose of grabbing mineral lands. There was not the slightest chance on earth of passing such a bill through the House of Representatives if there was the slightest suspicion that the bill could be used for the *purpose of acquiring mineral lands under the guise of obtaining agricultural lands.* This reservation from all characters of agricultural entries is usual; and, *without discussing the question of whether or not it is a good provision, I must say that it is the policy of Congress, as I see it, not to permit the acquisition of any character of minerals through any agricultural entry.*

53 Cong.Rec. S705, S707 (1916) (emphasis added). Following this exchange, Senator Thomas' amendment to strike the reservation clause was rejected. *See id.* at S712.

 In light of these Congressional proceedings, this Court is not persuaded by Bedroc's and Williams' contention that the reservation of only "valuable" minerals would exclude substances such as sand or gravel. "The cardinal principle of statuto-

ry construction is to save and not to destroy. It is [a court's] duty to give effect, if possible, to every clause and word of a statute...." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quotation omitted). However, this doctrine must be executed in a manner that advances and reflects the legislative history and purpose of the act. *See Estate of Reynolds v. Martin,* 985 F.2d 470, 473 (9th Cir.1993); *United States v. Canals–Jimenez,* 943 F.2d 1284, 1287 (11th Cir.1991). In view of Congressional hostility to fraudulent acquisitions of *any* mineral resources under the guise of agricultural land patents, it seems that the reference to "valuable" minerals merely implicates substances with desirable uses. *Cf. Northern Pac. Ry. Co. v. Soderberg,* 188 U.S. 526, 536–37, 23 S.Ct. 365, 47 L.Ed. 575 (1903) (discerning legislative intent to reserve geological deposits useful to the arts or manufacturing processes). Sand and gravel are obviously substances widely used in this nation's industrial pursuits. *See, e.g.,* Daniel C. Brown, *Porous Pavement,* Pit & Quarry, May 1, 1995, *available in* 1995 WL 12499285. Thus, it seems logical to place these substances within the ambit of the term "valuable minerals." Alternatively, even if a literal reading of the term would suggest a limiting construction, this Court must again eschew such an interpretation where it lies contrary to legislative intent. *See* Singer, *supra,* § 46.07.

Bedroc's and Williams' reliance on the real property's nonmineral designation is similarly misplaced. Bedroc and Williams contend that the nonmineral designation in 1934 (*see* Letter from Director, U.S. Geological Survey, to the Secretary of the Interior, Pls.' Mot. for S.J., Ex. 9, Doc. # 16.) indicates that the U.S. Government did not consider sand and gravel to be reserved substances under the Pittman Act. Prior to conveyance, Pittman Act patents were limited to "unreserved, unappropriated, nonmineral, nontimbered public lands." *See* H.Rep. No. 66–286, at 1. However, the U.S. Supreme Court has observed that the term "mineral lands" traditionally included those lands that were "chiefly" valuable for their mineral deposits. *See Northern Pac. R. Co.,* 188 U.S. at 536–37, 23 S.Ct. 365. Thus, it seems that if a parcel of land was adjudged valuable mainly for its non-mining purposes (e.g. agricultural exploitation) at the time of certification, it could be labeled "nonmineral," notwithstanding the actual presence of mineral substances reserved to the Government. Indeed, the legislative debates clearly bear out this interpretation. Representative Evans of Nevada and Representative Kinkaid of Nebraska, who presented the proposed Pittman bill to the U.S. House of Representatives, clarified this seeming contradiction:

> Mr. BLANTON: Mr. Speaker, reserving the right to object, will the gentleman permit and agree to an amendment to reserve the mineral rights of the Government?
>
> Mr. Kinkaid: They are reserved.
>
> Mr. EVANS: They are already reserved.
>
> Mr. BLANTON. The way I caught the bill it just spoke of the lands as nonmineral lands. Many lands classified as nonmineral and nonagricultural lands are, as a matter of fact, mineral and agricultural in some instances.
>
> Mr. TAYLOR of Colorado. Those reservations are made now by general law. It is not necessary to put that in. You cannot get oil land by homesteading nowadays.
>
> Mr. BLANTON. Is it all reserved?
>
> Mr. TAYLOR of Colorado. Yes.
>
> Mr. BLANTON. These lands come under the general reservation?
>
> Mr. TAYLOR. Yes.
>
> Mr. BLANTON. These homesteads today do not contain any oil?
>
> Mr. TAYLOR of Colorado. When you get a homestead, you do not get any oil under it. The oil that may be underneath it is reserved.
>
> Mr. BLANTON. This is not with respect to any homestead rights. It carries with it the right to exploitation

with regard to the reclaiming of arid lands.

Mr. TAYLOR of Colorado. Yes; by expending a lot of money and digging an artesian well.

Mr. BLANTON. If the mineral rights are properly reserved, I have no objection.

Mr. EVANS of Nevada. They are properly reserved. I am glad the gentleman has asked the question.

58 Cong.Rec. H6468, H6469 (1919). The statements of the committeeman in charge of presenting a bill to the House should be "taken as the opinion of the committee about the meaning of the bill." Singer, *supra*, § 48.14. Thus, Bedroc's and Williams' reliance on the nonmineral certification are otiose to the issue of sand and gravel ownership.[1]

 The Court's findings are reinforced by the "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *See Watt*, 462 U.S. at 59, 103 S.Ct. 2218 (quotations omitted). Bedroc's and Williams' protestations for a more liberal application of this doctrine are unfounded. A looser standard may apply only to federal inducements to "'undertake and accomplish great and expensive enterprises or works of a quasi public character,'" such as those required in the construction of the railroads. *Leo Sheep Co. v. United States*, 440 U.S. 668, 683, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) (quoting *United States v. Denver & Rio Grande Ry.*, 150 U.S. 1, 14, 14 S.Ct. 11, 37 L.Ed. 975 (1893)). Patents under the Pittman Act, while certain-

ly of benefit to Nevada agricultural production and state population growth, do not rise to the level of the mammoth construction efforts and great transformational effects railroad systems have played in our nation's history. *See, e.g.* Deborah A. Ballam, *The Evolution of the Government–Business Relationship in the United States: Colonial Times to Present*, 31 Am. Bus.L.J. 553, 579–82 (1994) (noting national economic effects of railroad construction).

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs Bedroc Limited, L.L.C.'s and Earl Williams' Motion for Summary Judgment (Doc. # 16) is DENIED.

IT IS FURTHER ORDERED that Defendants United States of America's, Interior Secretary Bruce Babbit's, the Department of the Interior's, the Bureau of Land Management's, and Area Manager Curtis L. Tucker's Brief in Support of Mineral Ownership and Opposition (Doc. # 26), requesting a judicial declaration finding the United States to be the owner of all valuable minerals underlying Bedroc's real property, including the sand and gravel deposits, is GRANTED, and that Judgment is hereby entered in favor of Defendant/Counterclaimants United States of America, Interior Secretary Bruce Babbit, the United States Department of the Interior, the Bureau of Land Management, and Curtis L. Tucker and against Plaintiff/Counterdefendants Bedroc Limited, L.L.C. and Earl Williams.

---

1. The Court also finds irrelevant Bedroc's and Williams' strenuous claims that the sand and gravel were exposed, rather than subsurface, deposits. (*See* Pls.' Mot. for S.J., Doc. # 16, at 15.) Senator Pittman made clear that a deposit's location did not affect the Government's rights:

 [I]f these minerals are disclosed on the surface of the ground, the ground is not subject to this bill. If they are not disclosed on the surface of the ground, still the Government desires to prevent any fraud on the Government in the acquisition of this land under the guise of entering it for agricultural purposes, while at the same time it may be to acquire large bodies of coal or other valuable minerals that are apparently concealed under the surface, but are known to the entryman.

 53 Cong.Rec. S705, S707 (1916).